1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ROBERT KIRKMAN, ET AL.,

             Plaintiffs,

    v.

AMC FILM HOLDINGS, LLC, ET AL.,

             Defendants.

No. 2:22-cv-09101-FLA-AJR

**MEMORANDUM DECISION AND ORDER GRANTING MOTION TO COMPEL (DKT. 64)**

**I.**

**INTRODUCTION**

      This is a breach of contract dispute arising out of the most successful television series in basic cable history, *The Walking Dead*.  (Dkt. 3-2 at 186.) Plaintiffs Robert Kirkman, Robert Kirkman, LLC, Gale Anne Hurd, Valhalla Entertainment, Inc., David Alpert, Circle of Confusion Productions, LLC, New Circle of Confusion Productions, LLC, Charles Eglee, United Bongo Drum, Inc., Glen Mazzara, and 44 Strong Productions, Inc. ("Plaintiffs") are key members of the creative team and production companies behind the television series.[1]  (Id. at 186-

_____

[1] Plaintiffs are all citizens of California.  (Dkt. 1 at 9.)

89.)  Plaintiffs allege that Defendants AMC Film Holdings, LLC, AMC Network Entertainment, LLC, and AMC Networks, Inc. ("Defendants") breached the terms of their profit-sharing agreements related to profits earned from the television series.[2] (Id. at 186-90.)  Plaintiffs' contracts with Defendants entitle them to various percentages of modified adjusted gross receipts ("MAGR").[3]  (Id. at 192.) Plaintiffs' contracts also require that Defendants calculate their MAGR on the most favorable basis afforded to any other individual profit participant on the series (referred to as "Most Favored Nation" or "MFN" rights).  (Id. at 192-93.)

Frank Darabont is a former executive producer and showrunner for the series that helped develop, write, and direct episodes during the show's first and second seasons.  (Id. at 191.)  Darabont and related production companies and agency Ferenc, Inc., Darkwoods Productions, Inc. and Creative Artists Agency, LLC (the "Darabont Plaintiffs") also had profit-sharing agreements with Defendants entitling them to various percentages of MAGR.  (Id. at 194-96.)  In December of 2013, the Darabont Plaintiffs filed suit in New York state court against Defendants alleging breach of their profit-sharing agreements.[4]  (Id. at 194-95.)  On July 16, 2021, the Darabont Plaintiffs settled their litigation with Defendants in exchange for an initial payment of $200 Million, plus additional future revenue payments.[5]  (Id. at 195-96.)

---

[2] Defendants are all incorporated under the laws of Delaware with their principal places of business in New York.  (Dkt. 1 at 9-10.)

[3] Plaintiffs' contracts contain New York choice-of-law clauses.  (Dkt. 3-2 at 230, 250, 272, 291, 323.)

[4] Darabont's underlying contract that formed the basis for the breach of contract claims contains a New York venue and choice-of-law clause.  (Dkt. 20-1 at 34.)

[5] The settlement resulted from a mediation that "was conducted virtually via Zoom."  (Dkt. 64-1 at 87.)  The Darabont Plaintiffs and counsel were primarily physically located in front of computers in California while the Defendants were primarily physically located in front of computers in New York, and the mediator was physically located in front of a computer in Hawaii.  (Id. at 88-89.)  At the start of the mediation, the participants signed a Confidentiality Agreement which states, (cont'd . . .)

2

In this lawsuit, Plaintiffs contend that Defendants' settlement with the Darabont Plaintiffs constitutes a more favorable calculation of MAGR and that Plaintiffs are therefore entitled to benefit from that more favorable calculation.  (Id. at 197-98.)  Plaintiffs have a copy of the Confidential Settlement Agreement and Mutual Release between the Darabont Plaintiffs and Defendants[6] (the "Darabont Settlement Agreement").  Plaintiffs are seeking discovery of Defendants' communications with the Darabont Plaintiffs related to the settlement in an effort to prove that the Darabont Settlement Agreement constitutes a more favorable calculation of MAGR.  (Dkt. 64 at 6-10.)  For the reasons set forth below, the Court GRANTS Plaintiffs' Motion to Compel Production of Documents Withheld as Privileged (the "Motion to Compel").  (Dkt. 64.)

## II.

## PROCEDURAL HISTORY

Plaintiffs initially filed the Complaint in this action in the Los Angeles County Superior Court on November 14, 2022.  (Dkt. 3-2 at 185.)  On December 15, 2022, Defendants removed the action to the U.S. District Court for the Central District of California, based on diversity jurisdiction.  (Dkt. 1.)  On January 13, 2023, Defendants filed a Motion to Dismiss the action arguing that under the plain language of the Darabont Settlement Agreement, Defendants did not give the

---

"[t]o the extent that they are applicable, state law and/or the Federal Rules of Evidence apply to this mediation."  (Dkt. 66-1 at 2.)

[6] The defendants who signed the Darabont Settlement Agreement are not exactly the same entities as Defendants here, but the difference does not appear to matter. The defendants who signed the Darabont Settlement Agreement are AMC Network Entertainment, LLC, AMC Film Holdings, LLC, AMC Networks, Inc., and Stu Segall Productions, Inc. (Dkt. 20-1 at 2.)  The Darabont Settlement Agreement contains a recital stating that "the Parties participated in mediation on May 18-19 and June 7, 2021, before a California mediator under California's mediation privilege, Cal. Evid. Code § 1119."  (Id. at 3.)

Darabont Plaintiffs a more favorable calculation of MAGR. (Dkt. 18-1 at 20-24.) Defendants attached the Darabont Settlement Agreement as an exhibit to their Motion to Dismiss. (Dkt. 18-3 at 2.)

On March 25, 2024, the District Judge issued an Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. (Dkt. 49.) In the Order, the District Judge concluded that viewing the allegations of the Complaint and the documents referenced therein liberally and in context, Plaintiffs had plausibly pled that the Darabont Settlement Agreement constituted a more favorable computation and definition of MAGR. (Id. at 9.) The District Judge specifically disagreed with Defendants' argument that interpretating the Darabont Settlement Agreement as creating a new and more favorable definition of MAGR would be commercially unreasonable and contrary to the parties' expectations. (Id. at 10.) As explained in the Order:

> "It is undisputed Defendants were aware of Plaintiffs' agreements and the MFN provisions therein when they entered into the Darabont Settlement. Defendants, thus, knew or should have known Plaintiffs could seek to enforce the MFN provisions to obtain the same computation of their future contingent compensation rights as Darabont and CAA. See Mot. Br. at 25 (recognizing 'in the entertainment business, profit participation litigation is exceedingly common,' and that sophisticated parties negotiating contracts would have been aware of the effect an agreement may have on contracts with other profit participants). It would be an illogical interpretation of the MFN provisions and contrary to the reasonable expectations of the parties in entering into the agreements if the court were to allow Defendants, as a matter of law, to provide Darabont and CAA with increased contingent compensation and a greater share of future gross receipts for the series through a settlement agreement—at Plaintiffs' expense—without providing Plaintiffs the same."

(Id. at 11.)

4

The District Judge also specifically disagreed with Defendants' argument that allowing the action to proceed would invade Defendants' attorney-client privilege and undermine California's strong public interest in encouraging settlements." (Id. at 12.)  As explained in the Order:

> "Neither discovery into Defendants' communications with Darabont and CAA nor a computation of MAGR based on the terms of the Darabont Settlement and information disclosed in Defendants' profit participation statements would require Defendants to disclose confidential attorney-client communications.  Similarly, requiring Defendants to provide the same MAGR computation to Plaintiffs would not violate California public policy regarding settlements, as Defendants knew or should have known Plaintiffs could seek similar contingent compensation based on the MFN provisions when they negotiated and entered into the Darabont Settlement.[FN 4]
>
>> [FN 4] Defendants cite Village Northridge Homeowners Association v. State Farm Fire & Casualty Co., 50 Cal. 4th 913, 930 (2010), to argue California has a strong public policy favoring settlements.  Mot. Br. at 27.  Village Northridge does not stand for the proposition that a settling party's unrelated agreements with non-parties to the settlement should be interpreted in a manner beneficial to the settling party if terms in the settlement agreement would render the non-parties' agreements more costly or unfavorable to the settling party.  Defendants' argument lacks merit."

(Id.)

As set forth above, the District Judge largely denied the Motion to Dismiss. (Dkt. 49.)  The District Judge granted the Motion to Dismiss only with regard to Plaintiffs' third cause of action seeking to permanently enjoin Defendants from proceeding with an arbitration filed with JAMS.  (Id. at 2 n.2.)  Defendants had already voluntarily dismissed the arbitration in question and Plaintiffs did not object

5

to the dismissal of the third cause of action without prejudice.  (<u>Id.</u>)  Following the ruling on the Motion to Dismiss, Defendants filed an Answer and Affirmative Defenses to Plaintiffs' Complaint (the "Answer").  (Dkt. 50.)  In the Answer, Defendants continue to deny that the Darabont Settlement Agreement constitutes a more favorable calculation of MAGR.  (<u>Id.</u> at 2-3.)

On July 1, 2024, the parties requested an informal discovery conference to discuss a dispute over discovery of communications between the Darabont Plaintiffs and Defendants related to the Darabont Settlement Agreement.  (Dkt. 58.)  The Court held an informal discovery conference with the parties on July 11, 2024. (Dkt. 59.)  Recognizing that this dispute was not amenable to compromise and required briefing and a ruling to resolve, the Court set a briefing schedule for Plaintiffs to file a motion to compel.  (<u>Id.</u>)  On July 26, 2024, Plaintiffs filed a Motion to Compel.  (Dkt. 64.)  On August 14, 2024, Defendants filed an Opposition to Plaintiffs' Motion to Compel (the "Opposition").  (Dkt. 70.)  On August 28, 2024, Plaintiffs filed a Reply in Support of the Motion to Compel (the "Reply").  (Dkt. 77.)  On September 9, 2024, the Court held a hearing on the Motion to Compel for the parties to provide oral argument.  (Dkt. 78.)  Following the hearing, the Court took the Motion to Compel under submission.  (<u>Id.</u>)

### III.

### LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) governs the scope of discovery in federal cases and provides that parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.  Federal Rule of Evidence 401 provides that evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Relevance under Rule 26(b)(1) is defined broadly.  <u>See, e.g.</u>, <u>Snipes v. United States</u>, 334 F.R.D. 548, 550 (N.D. Cal.

2020); <u>V5 Techs. v. Switch, Ltd.</u>, 334 F.R.D. 306, 309 (D. Nev. 2019) (noting that relevance for discovery purposes remains broad even after the 2015 amendments to the Federal Rules of Civil Procedure), <u>aff'd sub nom.</u>, <u>V5 Techs., LLC v. Switch, LTD.</u>, 2020 WL 1042515 (D. Nev. Mar. 3, 2020).  In addition to relevance, Rule 26(b)(1) requires that discovery be proportional to the needs of the case. Proportionality is determined by a consideration of the following factors: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. Proc. 26(b)(1).  "Information within this scope of discovery need not be admissible in evidence to be discoverable."  <u>Id.</u>

As set forth above, Rule 26(b)(1) expressly recognizes that privileged matters fall outside the scope of discovery.  However, "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged[,] . . . the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. Proc. 26(b)(5)(A).  "In essence, the party asserting the privilege must make a *prima facie* showing that the privilege protects the information the party intends to withhold."  <u>In re Grand Jury Investigation</u>, 974 F.2d 1068, 1071 (9th Cir. 1992).  The Ninth Circuit has "previously recognized a number of means of sufficiently establishing the privilege, one of which is the privilege log approach."  <u>Id.</u>  "The party asserting an evidentiary privilege has the burden to demonstrate that the privilege applies to the information in question."  <u>Tornay v. United States</u>, 840 F.2d 1424, 1426 (9th Cir. 1988). Boilerplate objections or blanket refusals inserted into a discovery response are insufficient to meet this burden.  <u>See</u> <u>Burlington N. & Santa Fe Ry. Co. v. U.S. Dist.</u>

Ct. for Dist. of Mont., 408 F.3d 1142, 1149 (9th Cir. 2005).  Indeed, failure to
provide sufficient information to support the privilege may constitute waiver of the
privilege.  See, e.g., Eureka Fin. Corp. v. Hartford Accident & Indem. Co., 136
F.R.D. 179, 182-83 (E.D. Cal. 1991).

Federal Rule of Civil Procedure 34(a) provides that a party may serve on
another a request for production of documents, electronically stored information, or
tangible things within the scope of Rule 26(b).  Where a party fails to produce
documents requested under Rule 34, the requesting party may move to compel
discovery.  Fed. R. Civ. Proc. 37(a).  "Upon a motion to compel discovery, the
movant has the initial burden of demonstrating relevance."  Nguyen v. Lotus by
Johnny Dung Inc., 2019 WL 3064479, at *2 (C.D. Cal. June 5, 2019) (internal
quotation marks omitted).  "Thereafter, the party opposing discovery has the burden
of showing that the discovery should be prohibited, and the burden of clarifying,
explaining or supporting its objections."  Garces v. Pickett, 2021 WL 978540, at *2
(E.D. Cal. Mar. 16, 2021).  "The opposing party is required to carry a heavy burden
of showing why discovery was denied."  Id. (internal quotation marks omitted).
Specifically, the party opposing discovery must show that the requested discovery is
unreasonably cumulative or duplicative, or can be obtained from some other source
that is more convenient, less burdensome, or less expensive, the party seeking
discovery has had ample opportunity to obtain the information by discovery in the
action, or the proposed discovery is outside the scope permitted by Rule 26(b)(1).
See Fed. R. Civ. Proc. 26(b)(2)(C).  The opposing party must specifically detail the
reason why the request is improper.  See Beckman Indus., Inc. v. Int'l Ins. Co., 966
F.2d 470, 476 (9th Cir. 1992) ("Broad allegations of harm, unsubstantiated by
specific examples or articulated reasoning, do not satisfy the Rule 26(c) test."
(internal quotation marks omitted)).

# IV.

# DISCUSSION

Plaintiffs seek to compel Defendants to produce documents in response to requests for production Nos. 1-4 and 8-9.  (Dkt. 64 at 10.)  These requests for production seek the following:  (1) communications with the Darabont Plaintiffs' counsel before, during, and after they held a mediation with Defendants; (2) communications with the mediator and any briefs or other submissions to the mediator; (3) drafts of the Darabont Settlement Agreement that were exchanged; and (4) the Darabont Settlement Agreement itself.  (Dkt. 64-1 at 96-97.)  The requests for production also ask that Defendants produce a privilege log.  (Id. at 95-96.)  Defendants objected to these requests on numerous grounds, including New York settlement privilege and California mediation privilege.  (Id. at 109-18.)  Defendants also objected to these requests to the extent the information or documents were protected by the Confidentiality Agreement entered between Defendants and the Darabont Plaintiffs as part of their mediation.  (Id.)  Subject to those objections, Defendants agreed to produce nonprivileged responsive documents.  (Id.)  As of today, Defendants have not produced a privilege log.  (Id. at 130-34.)

For the reasons set forth below, the Court concludes that Plaintiffs have met their initial burden of demonstrating relevance and proportionality.  However, Defendants have not met their burden of demonstrating that privilege applies to the requested discovery.  First, the Court concludes that New York privilege law must be applied to this dispute under Federal Rule of Evidence 501.  Second, the Court concludes in the alternative, that even under California's choice-of-law principles, the Court would still apply New York privilege law to this dispute.  Third, the Court concludes that the requested discovery is not privileged under New York law.  Accordingly, the Court overrules Defendants' objections based on New York mediation privilege, New York settlement privilege, California mediation privilege,

and the Confidentiality Agreement entered between Defendants and the Darabont
Plaintiffs as part of their mediation.

**A.      Plaintiffs Have Met Their Initial Burden Of Demonstrating Relevance
And Proportionality.**

As set forth above, the interpretation and meaning of the Darabont Settlement
Agreement is at the very core of this case.  Indeed, it serves as the basis for both
Plaintiffs' breach of contract claim in the Complaint and Defendants' defense
asserted in the Motion to Dismiss and the Answer.  (Dkt. 3-2 at 197-98; Dkt. 18-1 at
20-24; Dkt. 50 at 2-3.)  Therefore, the Court easily concludes that the requested
discovery seeks relevant information.  See, e.g., Microsoft Corp. v. Immersion
Corp., 2008 WL 11343462, at *2 (W.D. Wash. Mar. 24, 2008) ("Immersion and
Sony eventually reached an agreement, but at the heart of the instant lawsuit is
whether this agreement triggered Immersion's obligations to pay Microsoft under
the SLA. Thus, settlement-related documents between Immersion and Sony in the
underlying patent litigation are directly relevant to Microsoft's breach of contract
claim, because such communications may potentially show whether Immersion
intended to keep its agreement with Sony within or outside the scope of the SLA.").

Defendants' Opposition does not appear to dispute the relevance of their
communications related to the settlement, but defense counsel did note at oral
argument that the Darabont Settlement Agreement is a fully integrated agreement.
(Dkt. 20-1 at 12.)  Regardless, both California and New York law permit the
consideration of extrinsic evidence to interpret or explain ambiguous language in a
fully integrated agreement.  See, e.g., Lonely Maiden Prods., LLC v. GoldenTree
Asset Mgmt., LP, 135 Cal. Rptr. 3d 69, 75 (Ct. App. 2011) ("Pursuant to the parol
evidence rule, extrinsic evidence cannot be used to contradict or supplement an
agreement if it is intended to be a final expression of that agreement and a complete
and exclusive statement of the terms. But extrinsic evidence is admissible to explain
or interpret ambiguous language."); Schron v. Troutman Sanders LLP, 20 N.Y.3d

10

430, 436 (2013) ("Parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract.").[7] Thus, the Court concludes that the negotiating history of the Darabont Settlement Agreement is still relevant to interpret the meaning of its terms.  See, e.g., Microsoft Corp., 2008 WL 11343462, at *2 (rejecting argument that negotiating history of fully integrated settlement agreement was irrelevant because extrinsic evidence may be considered for the purpose of aiding in the interpretation of the agreement). Accordingly, the Court concludes that Plaintiffs have met their initial burden of demonstrating the relevance of the requested discovery.  See Nguyen, 2019 WL 3064479, at *2.

Defendants' Opposition also does not appear to challenge the proportionality of the requested discovery to the needs of the case.  Given the importance of the requested discovery to Plaintiffs' breach of contract claims, the enormous amount of money in controversy, the fact that only Defendants have access to the requested discovery, Defendants' robust resources, and the lack of any demonstrated burden from Defendants, the Court easily concludes that the requested discovery is proportional to the needs of the case.  See Fed. R. Civ. Proc. 26(b)(1).  Therefore, the Court must next determine whether Defendants have met the "heavy burden" of showing why the discovery sought should be denied.  See Garces, 2021 WL 978540, at *2 (internal quotation marks omitted).

**B.**     **<u>Defendants Have Not Met Their Burden Of Demonstrating That Privilege Applies.</u>**

As set forth above, Defendants objected to the requests for production at issue based on numerous grounds, including New York settlement privilege and California mediation privilege.  (Dkt. 64-1 at 109-18.)  Defendants have the burden

---

[7] Because California and New York law are substantially the same on this point, the Court need not resolve which state's law would apply on this issue.

to demonstrate that the asserted privileges apply to the requests for production at issue.  See Tornay, 840 F.2d at 1426.  Thus, the Court turns to the question of whether the privileges asserted by Defendants apply.

"Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."  Gasperini v. Ctr. for Humans., Inc., 518 U.S. 415, 427 (1996).  The Ninth Circuit has recognized that "some state law rules of evidence in fact serve substantive state policies and are more properly rules of substantive law within the meaning of Erie."  Feldman v. Allstate Ins. Co., 322 F.3d 660, 666 (9th Cir. 2003) (internal quotation marks omitted).  State evidentiary privileges qualify as substantive law under the Erie doctrine.  See, e.g., Star Ed., Inc. v. U.S. Dist. Ct. for Cent. Dist. of California, 7 F.3d 856, 859 (9th Cir. 1993) (holding that California reporter's privilege applied in federal action based on diversity where state law provided the rule of decision).  Indeed, Federal Rule of Evidence 501 states that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."  "Rule 501, as it applies to federal civil cases, incorporates the doctrine of [Erie], and requires deference to any applicable state law governing privileges."  In re Grand Jury Investigation, 918 F.2d 374, 379 n.6 (3d Cir. 1990).

### 1.    New York's Privilege Law Applies.

The parties agree that under Federal Rule of Evidence 501, state privilege law applies to this discovery dispute.  (Dkt. 64 at 11; Dkt. 70 at 11.)  However, Plaintiffs contend that New York privilege law applies, while Defendants argue for California privilege law.[8]  (Dkt. 64 at 11; Dkt. 70 at 10-12.)  In 1987, the Ninth Circuit identified an ambiguity in Federal Rule of Evidence 501, explaining that Rule 501 "does not tell us which state law the forum state should apply."  KL Grp. v. Case,

---

[8] Plaintiffs acknowledged during oral argument that if applicable, California mediation privilege would preclude discovery of the requested settlement communications, absent waiver.

Kay & Lynch, 829 F.2d 909, 918 (9th Cir. 1987).  The Ninth Circuit further

explained that "[c]ommentators have suggested several methods for resolving this

choice of law issue: (1) Assume that the state 'which supplies the rule of decision' is

the state which also supplies the privilege law; (2) apply the privilege rules of the

state in which the federal court sits; or (3) apply the conflict of law doctrine of the

state in which the federal court sits."  Id.

In 1995, the Ninth Circuit appears to have resolved this ambiguity in Federal

Rule of Evidence 501 by holding that the state which supplies the rule of decision is

the state which also supplies the privilege law:

> "We find, however, that Federal Rule of Evidence 501 required application of
>
> the Alaska Evidence Rule. Federal Rule of Evidence 501 provides: '[I]n civil
>
> actions and proceedings, with respect to an element of a claim or defense as to
>
> which State law supplies the rule of decision, the privilege of a witness . . .
>
> shall be determined in accordance with State law.' Because Alaska state law
>
> supplied the rule of decision with respect to the claims in this case, Alaska
>
> privilege rules had to be applied."

Home Indem. Co. v. Lane Powell Moss & Miller, 43 F.3d 1322, 1328 (9th Cir.

1995) (emphasis added).  The above-quoted section constitutes the entirety of the

Ninth Circuit's discussion of which state law applies under Rule 501.

It is well established that district courts in this circuit are bound to follow the

holdings of published Ninth Circuit decisions absent some intervening authority

from the U.S. Supreme Court that is clearly irreconcilable with the Ninth Circuit

precedent.  See, e.g., Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003) (holding

that a district court may disregard a Ninth Circuit decision where it is "clearly

irreconcilable" with a later Supreme Court decision).  The holding of an opinion

includes all portions of the opinion necessary to the conclusion or result reached by

the court.  See, e.g., Seminole Tribe of Fla. v. Fla., 517 U.S. 44, 67 (1996) ("When

an opinion issues for the Court, it is not only the result but also those portions of the

opinion necessary to that result by which we are bound."); <u>Eisner v. Macomber</u>, 252 U.S. 189, 205 (1920) ("And what we have quoted from the opinion in that case cannot be regarded as obiter dictum, it having furnished the entire basis for the conclusion reached."). By contrast, "[a] statement is dictum when it is made during the course of delivering a judicial opinion, but is unnecessary to the decision in the case and is therefore not precedential." <u>Cetacean Cmty. v. Bush</u>, 386 F.3d 1169, 1173 (9th Cir. 2004) (internal quotation marks, brackets, and ellipses omitted); <u>see also</u> <u>Labyrinth Optical Techs., LLC v. Fujitsu Am., Inc.</u>, 2013 WL 12126111, at *5 (C.D. Cal. Aug. 21, 2013) ("One academic attempt to capture the precise distinction between holdings and other statements in a judicial opinion is that a holding consists of both the conclusion and the material facts upon which the conclusion is based.").

With regard to the <u>Home Indem. Co.</u> opinion, the conclusion reached by the Ninth Circuit as relevant here was that the district court did not err in denying the appellee's motion for judgment notwithstanding the verdict and/or for a new trial.[9] <u>See</u> <u>Home Indem. Co.</u>, 43 F.3d at 1325, 1332. The issue on appeal was whether the district court erred by not finding a waiver of the attorney-client privilege. <u>See</u> <u>id.</u> at 1325-26. The appellee argued that the district court erred in applying Alaska Rule of Evidence 512 to the attorney-client privilege issue because the rule was procedural, not substantive, and therefore should not apply in a federal action based on diversity jurisdiction. <u>See</u> <u>id.</u> at 1327-28. However, the Ninth Circuit unequivocally rejected this argument, finding that "Federal Rule of Evidence 501 required application of the Alaska Evidence Rule." <u>Id.</u> at 1328. And after quoting Rule 501, the Ninth Circuit stated that "[b]ecause Alaska state law supplied the rule of decision with respect to the claims in the case, Alaska privilege rules had to be

---

[9] The Ninth Circuit also concluded that the district court did not err in denying the appellant's motion to amend the judgment, but that aspect of the opinion did not involve the interpretation of Federal Rule of Evidence 501 that is relevant here. <u>See</u> <u>Home Indem. Co.</u>, 43 F.3d at 1331-32.

14

applied." Id.  The Ninth Circuit further concluded that Alaska's law of privilege included Alaska Evidence Rule 512 and therefore "the district court properly applied Alaska Rule of Evidence 512" to the attorney-client privilege issue.  Id.  The Ninth Circuit ultimately affirmed the district court's denial of the motion for judgment notwithstanding the verdict and/or a new trial by finding that substantial evidence supported the jury's verdict and that the district court did not abuse its discretion in refusing to grant a new trial.  Id. at 1331.

As set forth above, it is obvious that the portion of the opinion stating that Federal Rule of Evidence 501 required the district court to apply Alaska privilege law because Alaska state law supplied the rule of decision was necessary to the Ninth Circuit's ultimate conclusion that the district court did not err in denying the motion for judgment notwithstanding the verdict and/or a new trial.  See Home Indem. Co., 43 F.3d at 1328-29, 1331.  Indeed, every opinion that the parties or this Court have been able to find recognizes this portion of the Home Indem. Co. opinion as binding precedent.  See Shufeldt v. Baker Donelson Berman Caldwell & Berkowitz P.C., 2022 WL 80470, at *5 (S.D. Cal. 2022) (citing Home Indem. Co. for the proposition that "[b]ecause Arizona substantive law applies[,] . . . the Court applies Arizona's mediation-privilege law"); Microsoft Corp., 2008 WL 11343462, at *2 (W.D. Wash. Mar. 24, 2008) (citing Home Indem. Co. for the proposition that "a federal court is compelled to apply the state law [of] privilege of the state that supplies the rule of the decision").  By contrast, Defendants point to two California district court cases that do not cite or discuss Home Indem. Co.  (See Dkt. 70 at 11-12 (citing Deutsche Bank v. Ameriquest, 2018 WL 5880117, at *4 (C.D. Cal. May 3, 2018) (holding that to determine which state's privilege law applies, a federal court sitting in diversity applies the forum state's choice of law rules); Bogard Constr., Inc. v. Oil Price Info. Serv., LLC, 604 F. Supp. 3d 895, 900 (N.D. Cal. 2022) (same)).)  However, the fact that these two opinions do not cite or discuss Home Indem. Co. renders them unpersuasive on the issue presented here.  See, e.g.,

Webster v. Fall, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

When asked at oral argument whether this Court was bound by the holding in Home Indem. Co., Defendants' counsel argued that this Court was not bound to follow the ultimate conclusion from that case because the opinion did not specifically explain why Federal Rule of Evidence 501 requires federal courts sitting in diversity to apply the privilege law of the state that supplies the rule of decision, as opposed to applying either the privilege law of the forum state or the choice-of-law rules of the forum state. The reason the lack of explanation is significant is because Alaska was both the forum state and the state that supplied the rule of decision. See Home Indem. Co., 43 F.3d at 1326 ("Because this is a diversity action, we apply the substantive law of the forum state, Alaska."). Therefore, Defendants' counsel argued that it is not clear the Ninth Circuit appreciated the ambiguity under Federal Rule of Evidence 501 as to which state's privilege law applies.

However, the Ninth Circuit has expressly rejected the argument that the holding of a case must be supported by sufficient rationale to have precedential force under the doctrine of *stare decisis*:

> "*Stare decisis* is the policy of the court to stand by precedent; the term is but an abbreviation of *stare decisis et non quieta movere*—'to stand by and adhere to decisions and not disturb what is settled.' Consider the word '*decisis*.' The word means, literally and legally, the decision. Nor is the doctrine *stare dictis*; it is not 'to stand by or keep to what was said.' Nor is the doctrine *stare rationibus decidendi*—'to keep to the *rationes decidendi* of past cases.' Rather, under the doctrine of *stare decisis* a case is important only for what it decides—for the 'what,' not for the 'why,' and not for the 'how.' Insofar as precedent is concerned, *stare decisis* is important only for the

16

decision, for the detailed legal consequence following a detailed set of facts." In re Osborne, 76 F.3d 306, 309 (9th Cir. 1996).[10]  In other words, "the doctrine of *stare decisis* concerns the *holdings* of previous cases, not the rationales . . . ."  Id.

The Ninth Circuit also rejected the argument that the holding of a prior case is not binding simply because part of the holding was unchallenged by the parties.  See id. at 311 ("Finally, we are unpersuaded by Appellant's argument that In re Tomlan does not control merely because the law was 'unchallenged' by the parties."). Therefore, it does not matter that the parties to Home Indem. Co. did not challenge the application of the privilege law of the state that supplied the rule of decision in favor of applying the law of the forum state.  See Home Indem. Co., 43 F.3d at 1328.  Thus, the Court concludes that it is bound to follow the holding of Home Indem. Co. that under Federal Rule of Evidence 501, federal courts sitting in diversity must apply the privilege law of the state that supplies the rule of decision. See, e.g., Hart v. Massanari, 266 F.3d 1155, 1170 (9th Cir. 2001) ("If a court must decide an issue governed by a prior opinion that constitutes binding authority, the later court is bound to reach the same result, even if it considers the rule unwise or incorrect. Binding authority must be followed unless and until overruled by a body competent to do so.").[11]

---

[10] Defendants also argue that "federal courts sitting in diversity [must] apply the same choice of law rules as a state court in their jurisdiction—because a different result (i.e., one in which federal courts in diversity applied *different* rules than their local state courts) would lead to forum-shopping and violate the Erie doctrine." (Dkt. 70 at 10.)  However, if the choice of privilege law depended on the choice-of-law rules of the forum state, that could still lead to different outcomes in this case (and encourage forum shopping) based on whether Plaintiff filed this action in New York versus California.  By contrast, applying the rule from Home Indem. Co. that the state that supplies the rule of decision is the state privilege law that applies would ensure consistent results in this case (and discourage forum shopping) regardless of whether Plaintiff filed this action in New York versus California.

[11] The prior Chief Judge of this district concluded that a different aspect of the holding in Home Indem. Co. was binding precedent despite the fact that other (cont'd . . .)

17

The parties agree that "New York supplies the rules of decision for resolving Plaintiffs' claims." (Dkt. 33 at 5, Joint Rule 26(f) Report; see Dkt. 64 at 11; Dkt. 70 at 8.) Accordingly, under Federal Rule of Evidence 501, as interpreted by the Ninth Circuit in Home Indem. Co., this Court must apply New York privilege law to the instant discovery dispute. See Microsoft Corp., 2008 WL 11343462, at *4 (relying on Home Indem. Co. to hold that under Rule 501, Washington privilege law applied to the discoverability of settlement communications because Washington law supplied the rule of decision, and rejecting argument that California mediation privilege applied because California had the most significant relationship to the underlying events). Moreover, the Court would reach the same conclusion even if Home Indem. Co. were not controlling on this issue, which it is. Therefore, in an abundance of caution, the Court sets forth its alternative rationale below.

## 2. Even If Choice-Of-Law Analysis Were Required, The Court Would Still Apply New York Privilege Law.

As set forth above, the Court concludes that it is bound by Home Indem. Co. to apply New York privilege law because New York supplies the rule of decision for

circuits had reached a contrary conclusion and that aspect of the holding had been the subject of academic criticism. See Manfred v. Superstation, Inc., 2010 WL 2464820, at *2 (C.D. Cal. June 14, 2010) ("It is not for this Court to decide whether the Ninth Circuit incorrectly applied preexisting Supreme Court precedent in reaching its holding in Home Indemnity, and the Court will follow Home Indemnity."). The issue in Manfred was whether Federal Rule of Civil Procedure 68 controlled the issue of enhanced prejudgment interest in a diversity action instead of California law. See id. at *2. In Home Indem. Co., the Ninth Circuit held that the district court correctly denied the request for enhanced prejudgment interest under Alaska law because Federal Rule of Civil Procedure 68 applied and did not provide for higher rates of interest. See Home Indem. Co., 43 F.3d at 1331-32. Therefore, in Manfred, Chief Judge Collins concluded that "the Ninth Circuit addressed the same issues raised by Plaintiff here in reaching the opposite conclusion." Manfred, 2010 WL 2464820, at *2. Similarly here, the Court concludes that the Ninth Circuit addressed the same issue raised in this case regarding which state privilege law applies in a federal diversity action and concluded that the law of the state that supplies the rule of decision applies. See Home Indem. Co., 43 F.3d at 1328.

resolving Plaintiffs' claims.  However, Defendants contended at oral argument that Home Indem. Co. was not binding on this issue and that the Court should instead apply the choice-of-law principles of the forum state.  (Dkt. 70 at 10 ("To determine which law to apply, this Court must perform a choice of law analysis. And to perform that analysis, this Court, sitting in diversity in California, applies California's choice of law rules—just as a California court would.").)  Accordingly, the Court explains below why it would apply New York privilege law even if Defendants were correct that California's choice-of-law principles applied (they do not).[12]

"California has two different analyses for selecting which law should be applied in an action."  Washington Mut. Bank, FA v. Superior Ct., 24 Cal. 4th 906, 914-15 (2001).  First, California courts ask whether "the parties have an agreement that another jurisdiction's law will govern their disputes," and if so, California courts analyze "the enforceability of contractual choice-of-law provisions."  Id. Second, "when there is no advance agreement on applicable law, but the action involves the claims of residents from outside California, the trial court may analyze the governmental interests of the various jurisdictions involved to select the most appropriate law."  Id.

Here, Defendants argue that this Court "should apply California's mediation privilege to this dispute because that is the law the parties to the mediation agreed would govern their mediation and settlement communications."  (Dkt. 70 at 12-13

---

[12] Plaintiffs contend that if the Court engages in a choice-of-law analysis, then New York choice-of-law principles should apply.  (Dkt. 64 at 11.)  However, both parties acknowledged at oral argument that the choice-of-law analysis is substantially similar under both California and New York law.  The Court applies California choice-of-law principles in this alternative holding because Defendants advocate for California principles and the Court ultimately disagrees with Defendants' argument that California privilege law applies even when using Defendants' preferred choice-of-law principles.  Moreover, the Court would reach the same outcome applying New York's choice-of-law principles.

(emphasis added).)  However, Defendants rely on three cases where the parties to the action had all signed the mediation agreement at issue.  (Id. at 13 (citing Perez v. Indian Harbor Ins. Co., 613 F. Supp. 3d 1171, 1181 (N.D. Cal. 2020); Vargas v. Quest Diagnostics, 2021 WL 4642749, at *2 (C.D. Cal. Aug. 19, 2021); Apollo Educ. Grp., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 784 F. App'x 500, 502 (9th Cir. 2019)).)  First, in Perez, the plaintiff filed a complaint containing allegations and exhibits using materials from the mediation of a prior case (Perez I) in which all parties to the current action participated and signed a mediation confidentiality agreement.  See Perez, 613 F. Supp. 3d at 1180-81.  The Perez court reviewed the agreement and concluded "that the confidentiality agreement – as agreed to by the parties in the Perez I litigation – applies in this matter, and therefore California state's mediation confidentiality provisions guide the Court in its determination of whether the materials should be stricken."  Id. at 1181.

Second, in Vargas, the defendant sought to elicit testimony from a third-party participant in a prior mediation in the same action to show that the defendant gave primary consideration to the settlement proposal made during the mediation.  See Vargas, 2021 WL 4642749, at *1.  The Vargas court first denied the request to elicit the testimony because the testimony was not relevant.  See id. at *2 ("I still don't understand the relevance of the proposed discovery.").  In the alternative, the Vargas court also denied the request to elicit the testimony because the defendant was bound by the mediation confidentiality agreement it signed.  See id. at *3 ("The takeaway is that the mediation agreement indicated that the parties' discussions were to be governed by a variety of protections.  That precludes [defendant's] attempts to compel responses to settlement-related statements.").

Finally, in Apollo Educ. Grp., Inc., the plaintiff sought to introduce evidence from a mediation with defendant where the parties signed a mediation confidentiality agreement agreeing that the mediation would be subject to California mediation privilege.  See Apollo Educ. Grp., Inc., 784 F. App'x at 501.  The

20

plaintiff never disputed the enforceability of the mediation confidentiality agreement that it signed, but instead argued that the proffered evidence fell outside the scope of the agreement. See id. The Ninth Circuit ultimately affirmed the district court's rulings to exclude the evidence, concluding that the proffered evidence was covered by mediation privilege. See id. at 502-03.

By contrast here, Plaintiffs quite simply never agreed that the Darabont Settlement Agreement and preceding mediation would be covered by California's mediation privilege. Indeed, "[n]o contract can be enforced against a nonparty, which renders the choice-of-law provision unenforceable" as to Plaintiffs here. Hansen v. New Prime, Inc., 2023 WL 5421791, at *3 (C.D. Cal. June 22, 2023); see also Collie v. Icee Co., 266 Cal. Rptr. 3d 145, 149 (Ct. App. 2020) ("We conclude that Collie's predispute arbitration agreement is unenforceable for a reason that does apply to any contract: Icee cannot enforce a contractual provision to bind a nonparty."). The Court concludes that Defendants cannot enforce the California choice-of-law provision in the Darabont Settlement Agreement against Plaintiffs.

However, it is undisputed that Plaintiffs can enforce the New York choice-of-law provisions in Plaintiffs' profit-sharing agreements with Defendants. (See Dkt. 33 at 5, Joint Rule 26(f) Report; Dkt. 64 at 11; Dkt. 70 at 8.) The New York choice-of-law provisions state as follows:

> "GOVERNING LAW:  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND WHOLLY PERFORMED THEREIN WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW."

(Dkt. 3-2 at 230.)

> "THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL, SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE

21

TO CONTRACTS MADE AND WHOLLY PERFORMED THEREIN WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW."

(Id. at 250, 272, 291.)

"Choice of Law and Forum.  This Agreement shall be construed according to, and governed in all respects by, the laws of the State of New York."

(Id. at 323.)

The Court construes these choice-of-law provisions as directing this Court to apply the substantive law of New York to resolve Plaintiffs' claims.  (See Dkt. 33 at 5, Joint Rule 26(f) Report ("New York supplies the rules of decision for resolving Plaintiffs' claims.").)  As explained above, state evidentiary privileges qualify as substantive law under the Erie doctrine.  See, e.g., Star Ed., Inc., 7 F.3d at 859. Therefore, the Court construes the parties' choice-of-law provisions as directing the Court to apply New York privilege law to this dispute seeking to enforce Plaintiffs' profit-sharing agreements with Defendants.  Indeed, "[i]f the parties state their intention in an express choice-of-law clause, California courts ordinarily will enforce the parties' stated intention."  Hatfield v. Halifax PLC, 564 F.3d 1177, 1182 (9th Cir. 2009) (internal quotation marks and ellipses omitted).  California courts will enforce a choice-of-law provision so long as either "the chosen jurisdiction has a substantial relationship to the parties or their transaction," or "any other reasonable basis for the choice of law provision exists."  Id.

Here, the parties have already agreed that the New York choice-of-law provisions are enforceable.  (See Dkt. 33 at 5, Joint Rule 26(f) Report; Dkt. 64 at 11; Dkt. 70 at 8.)  Moreover, New York has a substantial relationship to the parties and their transaction based on the fact that Defendants have their principal places of business in New York.  (Dkt. 1 at 9-10.)  Although Defendants agreed with the Darabont Plaintiffs to apply California law to the Darabont Settlement Agreement and preceding mediation, (Dkt. 20-1 at 3, 12), Plaintiffs here are not seeking to

enforce the Darabont Settlement Agreement, but instead are seeking to enforce their profit-sharing agreements under which Defendants agreed to apply New York law. (Dkt. 3-2 at 186-90, 230, 250, 272, 291, 323.)  Accordingly, the relevant choice-of-law provisions are contained in Plaintiffs' profit-sharing agreements, not the Darabont Settlement Agreement.  Thus, the Court concludes that under California's choice-of-law principles, New York privilege law applies to this dispute.  See Hatfield, 564 F.3d at 1182.

Because the parties here (not the non-party Darabont Plaintiffs) have expressly agreed to apply New York law to this dispute, that is the end of the inquiry under California's choice-of-law principles.  See Washington Mut. Bank, FA, 24 Cal. 4th at 914-15.  However, if for some reason the parties' New York choice-of-law provisions were not dispositive, which they are, the Court would reach the same conclusion applying California's governmental interest analysis. "Under the governmental interest analysis approach, the forum in a conflicts situation must search to find the proper law to apply based upon the interests of the litigants and the involved states."  Nat'l Steel Prod. Co. v. Superior Ct., 210 Cal. Rptr. 535, 539 (Ct. App. 1985) (internal quotation marks and brackets omitted). "Further, under the governmental interest analysis when one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied."  Id. (internal quotation marks and brackets omitted).

California's governmental interest analysis has three steps.  See Washington Mut. Bank, FA, 24 Cal. 4th at 919.  "Under the first step of the governmental interest approach, the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California."  Id.  If "the trial court finds the laws are materially different, it must proceed to the second step and determine what interest, if any, each state has in having its own laws applied to the case."  Id. at 920.  "Despite materially different

23

laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied." Id. (internal quotation marks omitted). "Only if the trial court determines that the laws are materially different and that each state has an interest in having its own law applied, thus reflecting an actual conflict, must the court take the final step and select the law of the state whose interests would be more impaired if its law were not applied." Id. (internal quotation marks omitted).

Applying California's governmental interest analysis, the Court concludes at the first step that New York law materially differs from California law with regard to mediation and settlement privilege. As set forth below in great detail, the Court concludes that New York law does not recognize any mediation privilege and that New York's settlement privilege permits discovery of settlement communications. (See infra Section IV.B.3.) By contrast, California's mediation privilege expressly prohibits discovery of communications made during the mediation process. See Cal. Evid. Code § 1119. Thus, the Court must proceed to the second step and determine "what interest, if any, each state has in having its own laws applied to the case." Washington Mut. Bank, FA, 24 Cal. 4th at 920.

At the second step, the Court concludes that California has very little interest in having its laws applied here, while New York has a substantial interest in having its laws applied. California's connection to this discovery dispute stems from the fact that the Darabont Settlement Agreement contains a recital stating that "the Parties participated in mediation on May 18-19 and June 7, 2021, before a California mediator under California's mediation privilege, Cal. Evid. Code § 1119." (Dkt. 20-1 at 3.) However, the Confidentiality Agreement signed by the participants at the start of the mediation did not reference California's mediation privilege, and instead stated, "[t]o the extent that they are applicable, state law and/or the Federal Rules of Evidence apply to this mediation." (Dkt. 66-1 at 2.) Moreover, the mediation itself was not conducted in California. To the contrary,

24

Defendants' own discovery responses state that the "mediation was conducted virtually via Zoom." (Dkt. 64-1 at 87.) The Darabont Plaintiffs and counsel were primarily physically located in front of computers in California while the Defendants were primarily physically located in front of computers in New York, and the mediator was physically located in front of a computer in Hawaii. (Id. at 88-89.) And fundamentally, the purpose of the mediation was to settle litigation that had been proceeding in the New York state court for years. (Dkt. 20-1 at 2.) The litigation itself involved claims by the Darabont Plaintiffs for breach of profit-sharing agreements governed by a New York venue and choice-of-law clause. (Id. at 34.) Therefore, although "California's Legislature has a strong policy favoring mediation as an alternative to litigation," Simmons v. Ghaderi, 44 Cal. 4th 570, 578 (2008) (internal quotation marks omitted), that policy interest is greatly diminished here because the litigation being settled was proceeding in New York state court under New York law.

By contrast, New York's connection to this discovery dispute is firmly rooted in the New York choice-of-law provisions agreed to by the parties in Plaintiffs' contracts. (See Dkt. 3-2 at 230, 250, 272, 291, 323.) As explained above, California courts will enforce a choice-of-law provision so long as either "the chosen jurisdiction has a substantial relationship to the parties or their transaction," or "any other reasonable basis for the choice of law provision exists." Hatfield, 564 F.3d at 1182 (9th Cir. 2009). Here, the parties have already agreed that the New York choice-of-law provisions are enforceable. (See Dkt. 33 at 5, Joint Rule 26(f) Report; Dkt. 64 at 11; Dkt. 70 at 8.) Moreover, New York has a substantial relationship to the parties and their transaction based on the fact that Defendants have their principal places of business in New York. (Dkt. 1 at 9-10.) And fundamentally, the settlement communications sought by Plaintiffs all relate to litigation that took place over several years in New York state court, related to the enforcement of profit-sharing agreements governed by a New York venue and

25

choice-of-law provision.  (Dkt. 20-1 at 2, 34.)

Accordingly, the Court concludes that both California and New York have an interest in having their own law applied.  Therefore, the Court must move to the final step of California's governmental interest analysis and "select the law of the state whose interests would be more impaired if its law were not applied." Washington Mut. Bank, FA, 24 Cal. 4th at 919 (internal quotation marks omitted). "In making this comparative impairment analysis," the Court must consider "the function and purpose" of the state laws at issue.  Id. (internal quotation marks omitted).  Here, the Court easily concludes that the interests of New York would be more impaired if its law were not applied because New York has more connections to this discovery dispute than California.  See Feist v. RCN Corp., 2012 WL 12895679, at *8 (N.D. Cal. Aug. 13, 2012) ("As to the third inquiry, the court finds that the interests of New York would be most impaired if the laws of California are applied to Giles' claim of privilege, as New York has more connections to the parties and matters involved in [the underlying lawsuit] than California. Accordingly, the court finds that the law of New York should apply to Giles' claim of privilege.").

As set forth above, California's interest in enforcing its mediation privilege over this discovery dispute is greatly diminished because the litigation settled during the mediation proceeded in New York state court under New York law.  By contrast, New York's interest in enforcing its settlement privilege over this discovery dispute is firmly rooted in the New York choice-of-law provisions agreed to by the parties in Plaintiffs' contracts.  (See Dkt. 3-2 at 230, 250, 272, 291, 323.)  Moreover, California has a policy of respecting the intention of the parties in an express choice-of-law clause.  See Hatfield, 564 F.3d at 1182.  Thus, the Court concludes in the alternative that New York law applies to this discovery dispute based on California's governmental interest analysis.  Accordingly, the Court must next determine whether Defendants have met their burden to show that the documents

and information requested by Plaintiffs are privileged under New York law.

### 3. The Requested Discovery Is Not Privileged Under New York Law.

As an initial matter, New York law is clear that it does not recognize any mediation privilege.  See, e.g., Gen. Elec. Co. v. APR Energy PLC, 2020 WL 2061423, at *8 (S.D.N.Y. Apr. 29, 2020) ("New York has not adopted the Uniform Mediation Act, and no mediation privilege exists under New York law . . . ."); Hauzinger v. Hauzinger, 842 N.Y.S.2d 646, 647 (App. Div. 2007) ("Although appellant urges this Court to apply the confidentiality provisions in the Uniform Mediation Act as a matter of public policy, New York has not adopted that Act and we decline to do so."), aff'd, 10 N.Y.3d 923 (2008).  Accordingly, the fact that Defendants entered a Confidentiality Agreement as part of their mediation with the Darabont Plaintiffs is insufficient to establish privilege under New York law.  (See Dkt. 66-1 at 2); Hauzinger, 842 N.Y.S.2d at 647 ("[W]e reject appellant's contention that the court abused its discretion in refusing to enforce the confidentiality agreement entered into by the parties as part of the mediation process, and in refusing to quash the subpoena as a matter of public policy." (citation omitted)); Oasis Med., Inc. v. I-Med Pharma USA Inc., 2023 WL 6301728, at *10 (S.D.N.Y. Sept. 1, 2023) ("Oasis is correct that the Mediation Agreement, standing alone, is not grounds for withholding otherwise discoverable documents. Just as the parties to a settlement agreement cannot render it undiscoverable by inserting a confidentiality clause, neither can the parties to a mediation create their own privilege – enforceable against third parties – by contract alone." (citation omitted)); see also Mahoney v. Turner Const. Co., 872 N.Y.S.2d 433, 436 (2009) ("[D]isclosure of the terms of a settlement agreement by a settling party to a nonsettling party may be appropriate, despite the presence of a confidentiality clause in the agreement, where the terms of the agreement are material and necessary to the nonsettling party's case." (internal quotation marks omitted)).

However, New York law does recognize a settlement privilege under New York Civil Practice Law and Rules ("CPLR") 4547.  CPLR 4547 is titled "Compromises and offers to compromise," and states as follows:

> "Evidence of (a) furnishing, or offering or promising to furnish, or (b) accepting, or offering or promising to accept, any valuable consideration in compromising or attempting to compromise a claim which is disputed as to either validity or amount of damages, shall be inadmissible as proof of liability for or invalidity of the claim or the amount of damages. Evidence of any conduct or statement made during compromise negotiations shall also be inadmissible. The provisions of this section shall not require the exclusion of any evidence, which is otherwise discoverable, solely because such evidence was presented during the course of compromise negotiations. Furthermore, the exclusion established by this section shall not limit the admissibility of such evidence when it is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay or proof of an effort to obstruct a criminal investigation or prosecution."

N.Y. C.P.L.R. 4547 (McKinney).

As set forth above, the plain text of CPLR 4547 limits the admissibility of settlement communications, but places no limit on their discoverability.  See, e.g., City of Newburgh v. Hauser, 126 A.D.3d 926, 927 (N.Y. App. Div. 2015) ("Contrary to the plaintiff's contention, CPLR 4547 does not bar disclosure of the subject documents, as that statute is concerned with the admissibility of evidence, and does not limit the discoverability of evidence."); Town of Waterford v. New York State Dep't of Env't Conservation, 77 A.D.3d 224, 233 (N.Y. App. Div. 2010) ("CPLR 4547 provides that evidence regarding settlement negotiations is 'inadmissible as proof of liability for or invalidity of the claim or the amount of damages,' but says nothing as to the disclosure of that information. Even if we were to agree with respondent that these records were created as part of an effort to reach

a negotiated settlement, CPLR 4547 is not a rule designed to limit the scope of discovery and does not provide that settlement discussions are confidential or would be otherwise exempt under [New York's Freedom of Information Law].”), aff'd as modified, 18 N.Y.3d 652 (2012).

Moreover, the plain text of CPLR 4547 states that the rule does not limit the admissibility of settlement communications offered for a purpose other than to prove liability in the matter that is the subject of the communications.  See, e.g., Am. Re-Ins. Co. v. U.S. Fid. & Guar. Co., 19 A.D.3d 103, 104 (N.Y. App. Div. 2005) (“The so-called ‘settlement privilege’ is inapplicable since the reinsurers seek the settlement-related materials for a purpose other than proving [the insurer's] liability in the underlying coverage action (see CPLR 4547).”); In re Liquidation of Midland Ins. Co., 929 N.Y.S.2d 116, 121 (App. Div. 2011) (“The court properly denied Everest's motion for an order precluding the liquidator and Midland's policyholders from introducing evidence of settlements entered into by Everest as a direct insurer in other proceedings. . . . Everest's reliance on CPLR 4547 is misplaced because the disputed evidence is not offered ‘as proof of liability for or invalidity of any claim’ (id.). Moreover, the statute does not limit the admissibility of evidence offered for another purpose (id.).”).

Defendants contend that “New York's common-law settlement privilege protects against the discovery of confidential settlement communications.”  (Dkt. 70 at 16-17.)  However, CPLR 4547 was enacted in 1998 to codify and abrogate New York's common-law settlement privilege so that New York law would be consistent with federal law as it then existed.  See New York Bill Jacket, 1998 S.B. 6415, Ch. 317 (“[S]ince [the] proposed section would make New York and federal law consistent, it would aid courts in interpretation of the rule, afford an easy understanding of its scope, and would permit the same set of rules to govern the settlement of a dispute where the underlying controversy might be ultimately litigated in state or federal court.”); see also Cabrera v. Green Complex, Inc., 972

N.Y.S.2d 142, 2013 WL 2321693 at *5 (Civ. Ct. 2013) ("This provision codifies the common law rule that the settlement of a disputed claim or an offer to settle the claim is inadmiss[i]ble to prove either the liability of the alleged wrongdoer or the weakness of the cause of action."). Indeed, "CPLR 4547, which deals with the evidentiary effect of settlements and settlement negotiations, is an adoption, in substantially identical language, of the original version of Rule 408 of the Federal Rules of Evidence." N.Y. C.P.L.R. 4547 (McKinney, Practice Commentaries).

Certain aspects of CPLR 4547 constitute "a major change in New York law." Id. For example, "[t]he traditional rule in New York was that unqualified statements of fact made during settlement negotiations were admissible against the party who made the statements." Id.; see, e.g., White v. Old Dominion S.S. Co., 102 N.Y. 660, 662 (1886) ("There is no doubt but that the rule is well established in this country that the admission of a distinct fact which in itself tends to establish a cause of action or defense, is not rendered inadmissible from the circumstance that it was made during discussion relating to a compromise, unless it is expressly stated to be made without prejudice . . . ."). "To avoid admissibility, negotiators had to enter into particularized stipulations or preface their discussions with protective phrases such as 'This is without prejudice,' or 'Let's assume, hypothetically.'" N.Y. C.P.L.R. 4547 (McKinney, Practice Commentaries). CPLR 4547 abrogates the common law rule from White v. Old Dominion S.S. Co. in favor of the language in Federal Rule of Evidence 408 stating that evidence of any conduct or statement made during compromise negotiations shall also be inadmissible. Id.; see 5 N.Y. Prac., Evidence in New York State and Federal Courts § 4:58 ("The White rule was abrogated by CPLR 4547, which approximates the wording of the original version of Federal Rule of Evidence 408.").

Accordingly, Defendants' reliance on case law grounded in New York's common law prior to the enactment of CPLR 4547 in 1998 is misplaced. For example, Defendants rely on Crow-Crimmins-Wolff & Munier v. Westchester

Cnty., 511 N.Y.S.2d 117, 119 (1987), for the proposition that "there is a strong public policy in New York against disclosing settlement communications made in confidence." (Dkt. 70 at 15.)  However, the statements in Crow-Crimmins-Wolff & Munier relied on by Defendants are based on the common law rule from White v. Old Dominion S.S. Co.:

> "Admissions of fact explicitly or implicitly made 'without prejudice' during settlement negotiations are protected from discovery pursuant to the public policy of encouraging and facilitating settlement (see, White v. Old Dominion Steamship Co., 102 N.Y. 661, 662, 6 N.E. 289). Actions taken and observations made for the stated purpose of arriving at a settlement agreement, and expressly not for litigation, which actions would not have been accomplished except in a mutual attempt to reach a settlement, should likewise generally be protected by the same public policy of encouraging attempts at settlement."

Crow-Crimmins-Wolff & Munier, 511 N.Y.S.2d at 119.  Defendants quote this language as representing the current state of New York's settlement privilege, (Dkt. 70 at 15, 17), but the White rule has very clearly been abrogated by CPLR 4547. See N.Y. C.P.L.R. 4547 (McKinney, Practice Commentaries); 5 N.Y. Prac., Evidence in New York State and Federal Courts § 4:58.

Defendants argue that when applying the rule from Crow-Crimmins-Wolff & Munier, "courts have repeatedly held that documents exchanged during settlement negotiations and marked as confidential—including in mediation—are protected from disclosure." (Dkt. 70 at 15 (citing Lynbrook Glass & Architectural Metals, Corp. v. Elite Assocs., Inc., 656 N.Y.S.2d 291, 291 (N.Y. App. Div. 1997); Emps. Ins. Of Wausau v. Am. Home Prod. Corp., 655 N.Y.S.2d 950, 950 (N.Y. App. Div. 1997)).)  However, Lynbrook Glass & Architectural Metals, Corp. and Emps. Ins. Of Wausau were both issued in 1997, prior to the enactment of CPLR 4547, and both cases expressly rely on Crow-Crimmins-Wolff & Munier as authority for the

31

proposition that settlement communications are not discoverable.  See Lynbrook Glass & Architectural Metals, Corp., 656 N.Y.S.2d at 291; Emps. Ins. Of Wausau, 655 N.Y.S.2d at 950.

Defendants similarly argue that "New York courts thus routinely deny motions to compel settlement communications."  (Dkt. 70 at 17.)  However, to support this assertion, Defendants once again cite to Crow-Crimmins-Wolff & Munier and Emps. Ins. Of Wausau, with only one new case cited, Randall Elec., Inc. v. State, 150 A.D.2d 875, 876 (N.Y. App. Div. 1989).  (Id.)  However, Randall Elec., Inc. was issued in 1989, prior to the enactment of CPLR 4547, and expressly relies on Crow-Crimmins-Wolff & Munier and White as authority for the proposition that settlement communications are not discoverable.  See Randall Elec., Inc., 150 A.D.2d at 876.

Defendants next argue that "New York courts have continued to hold—long after CPLR 4547 was passed—that confidential settlement communications are protected from discovery under the common-law settlement privilege of New York."  (Dkt. 70 at 17.)  However, the only cases cited by Defendants in support of this assertion expressly rely on the abrogated White rule set forth in Crow-Crimmins-Wolff & Munier.  (Id. at 17-18 (citing Gordon v. Vill. of Bronxville, 799 N.Y.S.2d 160 (Sup. Ct. 2004); S.C. v. J.C., 938 N.Y.S.2d 229 (Sup. Ct. 2011); Vringo, Inc. v. ZTE Corp., 2015 WL 3498634 (S.D.N.Y. June 3, 2015)).)  Indeed, Gordon quotes Crow-Crimmins-Wolff & Munier for the proposition that "it is well settled in New York that '[a]dmissions of fact explicitly or implicitly made "without prejudice" during settlement negotiations are protected from discovery pursuant to the public policy of encouraging and facilitating settlement.'"  Gordon, 799 N.Y.S.2d 160, 2004 WL 2941317 at *3.  S.C. similarly relies on Crow-Crimmins-Wolff & Munier for the proposition that communications made to facilitate settlement may not be used in the litigation.  S.C., 938 N.Y.S.2d 229, 2011 WL 4834560 at *5.  Finally, Vringo, Inc. quotes both Crow-Crimmins-Wolff & Munier

and Randall Elec., Inc. for the proposition that New York recognizes the confidentiality of settlement communications.  See Vringo, Inc., 2015 WL 3498634, at *7 & nn.67-68.  As set forth above, both Crow-Crimmins-Wolff & Munier and Randall Elec., Inc. expressly rely on White as authority for the proposition that settlement communications are not discoverable.  See Crow-Crimmins-Wolff & Munier, 511 N.Y.S.2d at 119; Randall Elec., Inc., 150 A.D.2d at 876.  The Court also finds it significant that neither Gordon, S.C., nor Vringo, Inc. mention or discuss CPLR 4547, and both Gordon and S.C. are unreported dispositions.[13]

Gordon, S.C., and Vringo, Inc. are also all distinguishable because they involved settlement communications related to the same dispute being litigated.  For example, in Gordon, a proposed intervenor in the action opposed the sealing of the transcript of a settlement conference where the parties reached a preliminary settlement agreement that was contingent upon the transcript being sealed and would not become final until certain conditions precedent occurred.  See Gordon, 799 N.Y.S.2d 160, 2004 WL 2941317 at *1.  The trial court did not address a request for discovery, but instead ruled that the parties had established good cause for the court to seal the transcript under N.Y. Comp. Codes R. & Regs. tit. 22, § 216.1.  Id. at *2-4.  Indeed, the trial court determined that "the need to keep the transcript of these settlement negotiations and preliminary settlement confidential in order to achieve a settlement in this case outweighs [the proposed intervenor's] interest in being privy to the settlement conference held in this case (including the

---

[13] While it is apparently permissible to cite unreported trial court opinions in New York state courts, such opinions are not precedential and have very little persuasive value, particularly in the area of discovery.  See Eaton v. Chahal, 553 N.Y.S.2d 642, 646 (Sup. Ct. 1990) ("The second issue which warrants comment is the practice of citing to this court unreported decisions issued by judges of coordinate jurisdiction. Such decisions, although entitled to respectful consideration, are not binding precedent upon this court especially in an area, such as discovery, where the trial court is vested with broad discretion." (citation omitted)).

preliminary settlement that was read into the record).” Id.  In S.C., a wife sought to invalidate a post-nuptial agreement by introducing evidence of offers by her husband to modify the agreement.  See S.C., 938 N.Y.S.2d 229, 2011 WL 4834560 at *5.  The trial court did not address the discoverability of the husband's offers, but instead ruled that they were inadmissible because they were made to facilitate settlement.  See id.  Finally, in Vringo, Inc., the parties entered a non-disclosure agreement for the purpose of exploring settlement of patent litigation and one of the parties sued the other alleging breach of the agreement.  See Vringo, Inc., 2015 WL 3498634, at *1.  The trial court did not address the discoverability of the settlement communications, but instead ruled that the non-disclosure agreement was enforceable and was supported by the public policy of encouraging and facilitating settlement.  See id. at *7.

In contrast to the case law cited by Defendants, none of which address CPLR 4547, Plaintiffs cite several recent published appellate cases that specifically address CPLR 4547 and hold that settlement communications are discoverable under New York law.  (Dkt. 64 at 15-17 (citing Am. Re-Ins. Co., 19 A.D.3d at 104; City of Newburgh, 126 A.D.3d at 926-27).)  For example, in Am. Re-Ins. Co., the appellate division affirmed the trial court's order compelling production of settlement communications between an insurance company and its insureds related to coverage litigation that had been settled.  See 19 A.D.3d at 103-04.  The appellate division explained that "the disputed documents relating to settlement negotiations are discoverable since they are material and necessary to the reinsurers' defense of the action."  Id. at 104 (citation omitted).  The appellate division further explained that "[t]he so-called 'settlement privilege' is inapplicable since the reinsurers seek the settlement-related materials for a purpose other than proving [the insurer's] liability in the underlying coverage action."  Id. (citing N.Y. C.P.L.R. 4547 (McKinney)).  Similarly in City of Newburgh, the appellate division affirmed the trial court's order compelling production of settlement communications from a private mediation

between the plaintiff and a nonparty.  See 126 A.D.3d at 926-27.  The appellate division explained that "CPLR 4547 does not bar disclosure of the subject documents, as the statute is concerned with the admissibility of evidence, and does not limit the discoverability of evidence."  Id. at 927 (citation omitted).

Both Am. Re-Ins. Co. and City of Newburgh are directly analogous to Plaintiffs' requests for discovery of settlement communications between Defendants and the Darabont Plaintiffs, yet Defendants do not even address these cases in their Opposition.  (Dkt. 70.)  Moreover, the Court has identified additional published appellate authority holding that settlement communications are both discoverable and admissible under New York law.  See Town of Waterford, 77 A.D.3d at 233 (affirming disclosure of settlement communications under New York's Freedom of Information Law because "CPLR 4547 is not a rule designed to limit the scope of discovery and does not provide that settlement discussions are confidential"); In re Liquidation of Midland Ins. Co., 929 N.Y.S.2d at121 (affirming admissibility of settlements entered by insurer because the settlements were relevant to refute the insurer's challenge to the claims handling methodology and were not offered as proof of liability for or invalidity of any claim); Masterwear Corp. v. Bernard, 298 A.D.2d 249, 250 (N.Y. App. Div. 2002) ("Bernard's motion to compel disclosure of codefendant Mushkin's settlement agreement should have been granted. Although the settling parties agreed that their settlement would be confidential, Bernard has a strong interest in disclosure since it is undisputed both that plaintiffs' claims against him seek recoupment of improper payments allegedly made to Mushkin and that the settlement agreement contains admissions by this codefendant.").[14]

---

[14] The Court has also identified a published trial court opinion holding that "[s]ettlement offers may be disclosed in the process of discovery" and "[a] settlement agreement resolving other disputes and not used to show liability in an action may be admissible."  Chevere v. City of New York, 920 N.Y.S.2d 572, 579 (Sup. Ct. 2010), judgment entered sub nom. Chevere v. the City of New York (N.Y. Sup. Ct. 2011).

In sum, the Court is convinced based on the ample authority set forth above that New York privilege law permits discovery of settlement communications. It is well established that "[w]hen interpreting state law, federal courts are bound by decisions of the state's highest court." Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia, 379 F.3d 557, 560 (9th Cir. 2004) (internal quotation marks omitted). "In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." Id. (internal quotation marks omitted).[15] "And, where there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." Id. (internal quotation marks omitted).

As set forth above, neither the Court nor the parties have identified any authority on this issue from New York's highest court, but the Court and Plaintiffs have identified numerous published opinions on this issue from New York's intermediate appellate courts. Defendants have not addressed this directly applicable authority and instead offer only two unreported trial court opinions as well as an unpublished federal district court opinion, none of which the Court finds persuasive for the reasons set forth above.[16] Accordingly, this Court is bound to

---

[15] Case law interpreting Federal Rule of Evidence 408 also supports the Court's determination that New York privilege law permits discovery of settlement communications. As set forth above, the New York legislature adopted CPLR 4547 to bring New York privilege law into alignment with Federal Rule of Evidence 408. See New York Bill Jacket, 1998 S.B. 6415, Ch. 317; N.Y. C.P.L.R. 4547 (McKinney, Practice Commentaries). Indeed, it is well established that Federal Rule of Evidence 408 does not prevent discovery of settlement communications. See, e.g., Bd. of Trustees of Leland Stanford Junior Univ. v. Tyco Int'l Ltd., 253 F.R.D. 521, 523 (C.D. Cal. 2008) ("[T]here is no federal privilege preventing the discovery of settlement agreements and related documents.").

[16] Defendants also do not address the fact that the plain language of CPLR 4547 (cont'd . . .)

1
2

follow the numerous published opinions from New York's intermediate appellate courts set forth above. See Assurance Co. of Am., 379 F.3d at 560.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

Because New York law does not recognize mediation privilege and New York's settlement privilege does not prevent discovery of settlement communications, particularly when as here, those settlement communications are not being sought to prove liability in the underlying matter, the Court concludes that Defendants have not met their burden to show that the documents and information requested by Plaintiffs are privileged. See Microsoft Corp., 2008 WL 11343462, at *4 (holding that defendant had not met its burden to establish that the requested discovery was privileged because both Washington and federal law permit discovery of settlement communications "for purposes other than to establish liability"). And because Defendants have not met their burden to establish the existence of any applicable privilege, the Court need not address the parties' arguments related to waiver. See id. ("Because the Court has determined that the mediation privilege does not apply, it finds it unnecessary to address the parties' arguments with respect to whether Immersion waived the privilege."). In short, the Court concludes that Defendants have not met the "heavy burden" of showing why the discovery sought should be denied. Garces, 2021 WL 978540, at *2 (internal quotation marks

20
21
22
23
24
25
26
27
28

---

contemplates that settlement communications are admissible for purposes other than to prove liability for or invalidity of the claim or the amount of damages. See N.Y. C.P.L.R. 4547 (McKinney) ("[T]he exclusion established by this section shall not limit the admissibility of such evidence when it is offered for another purpose . . . ."). Given that settlement communications are admissible for certain purposes, they must also be discoverable. Cf. Williams v. Bridgeport Music Inc., 2014 WL 12498232, at *2 (C.D. Cal. July 10, 2014) ("Given that Rule 408 contemplates that a statement during settlement negotiations may become admissible, an absolute privilege against discovery would be inconsistent . . . ."); Matsushita Elec. Indus. Co. v. Mediatek, Inc., 2007 WL 963975, at *3 (N.D. Cal. Mar. 30, 2007) ("The inescapable conclusion that a privilege against disclosure cannot be found in Rule 408. To the contrary, because the Rule anticipates that settlement negotiations may be admissible, a privilege against their discovery would be inconsistent with Rule 26.").

omitted).

# V.

## CONCLUSION

Consistent with the foregoing, Plaintiff's Motion to Compel is GRANTED. (Dkt. 64.)  Specifically, the Court OVERRULES Defendants' objections based on New York mediation privilege, New York settlement privilege, California mediation privilege, and the Confidentiality Agreement entered between Defendants and the Darabont Plaintiffs as part of their mediation.  (Dkt. 64-1 at 109-18.)  The privacy rights of Defendants and the Darabont Plaintiffs can be sufficiently protected by producing responsive documents under the various confidentiality designations (as applicable) contained in the Stipulated Protective Order entered by the Court.  (Dkt. 57.)  Defendants shall have thirty days from the date of this Order to complete their production.  However, in the event Defendants seek review of this Order from the District Judge, then Defendants shall have thirty days from the date that the District Judge rules on the request for review.  If Defendants need additional time to complete their production, they should first meet and confer with Plaintiffs on the issue and if that does not resolve the issue, Defendants can request an informal discovery conference.

Finally, the Court notes that neither side sought an award of expenses with regard to this discovery dispute.  (Dkts. 64, 70, 77.)  Under Federal Rule of Civil Procedure 37(a)(5)(A), where a motion to compel is granted, the court must award the moving party's reasonable expenses incurred in making the motion unless the court finds that the movant filed the motion before attempting in good faith to obtain the disclosure without court action, the opposing party's nondisclosure, response, or objection was substantially justified, or other circumstances make an award of expenses unjust.  As the Court stated at the hearing on the Motion to Compel, this discovery dispute raised numerous complex legal issues such that the conclusions

set forth above were not at all obvious to the Court and took lengthy consideration and research to resolve.  Accordingly, the Court concludes that Defendants' privilege objections, although now overruled, were substantially justified and it would be unjust to award expenses to Plaintiffs.  <u>See</u> Fed. R. Civ. Proc. 37(a)(5)(A)(ii)-(iii).

IT IS SO ORDERED.

DATED:  September 23, 2024

_____
HON. A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE