SHELDON EISENBERG (SBN 100626)
 seisenberg@sullivantriggs.com
COURTNEY ELGART (SBN 344360)
 celgart@sullivantriggs.com
Sullivan & Triggs, LLP
1230 Montana Avenue, Suite 201
Santa Monica, California 90403
Telephone:   (310) 451-8300
Facsimile:   (310) 451-8303

JEAN RALPH FLEURMONT (Admitted *pro hac vice*)
 jrfleurmont@sullivantriggs.com
STEPHANIE COMMAND (admitted *pro hac vice*)
 scommand@sullivantriggs.com
Sullivan & Triggs, LLP
200 Massachusetts Ave., 7th Floor
Washington, D.C. 20001

Attorneys for Plaintiffs
Robert Kirkman, *et al.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Robert Kirkman, et al., <br><br> Plaintiffs, <br><br> v. <br><br> AMC Film Holdings LLC, et al., <br><br> Defendants | Case No.: 2:22-cv-09101-FLA-AJRx <br><br> Assigned for all purposes to <br> Hon. Fernando L. Aenlle-Rocha <br><br> **FIRST AMENDED COMPLAINT for:** <br><br> **1.    BREACH OF CONTRACT – THE WALKING DEAD (BASED ON THE DARABONT SETTLEMENT);** <br> **2.    BREACH OF CONTRACT – THE WALKING DEAD (BASED ON THE ███████ ADVANCES AND ███████ MFN AGREEMENT);** <br> **3.    BREACH OF CONTRACT – FEAR THE WALKING DEAD; and** <br> **3.    BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAR DEALING.** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Complaint filed: November 14, 2022 <br> Trial Date:        October 27, 2025 <br><br> REDACTED |

Plaintiffs Robert Kirkman, Gale Anne Hurd, David Alpert, Charles Eglee, and Glen Mazzara, and their respective loan-out corporations or related entities, Robert Kirkman LLC; Valhalla Entertainment, Inc. f/k/a Valhalla Motion Pictures, Inc.; Circle of Confusion Productions LLC and New Circle of Confusion Productions, Inc.; United Bongo Drum, Inc.; and 44 Strong Productions, Inc., demanding a jury trial, allege as follows:

**INTRODUCTION**

1.    Plaintiffs Robert Kirkman, Gale Anne Hurd, David Alpert, Charles Eglee, and Glen Mazzara are key members of the creative team behind the record-breaking success of the AMC series *The Walking Dead*. In exchange for their intellectual property rights and services, AMC agreed to pay Plaintiffs compensation that is contingent on the Series' success. That contingent compensation, also known as profit participation, takes the form of Plaintiffs' right to a percentage of contractually defined profits known as modified adjusted gross receipts or MAGR. Most significantly for purposes of this action, AMC guaranteed Plaintiffs that Plaintiffs' MAGR would always be calculated and paid on the most favorable basis afforded to any other individual profit participant on the Series. This guarantee is set forth in what is known as the most favored nation (or "MFN") provisions in the Plaintiffs' contracts with AMC (collectively, "Plaintiffs' MFN Rights").

2.    Even though AMC exploited Plaintiffs' ideas and services to make billions from *The Walking Dead* franchise, AMC issued a MAGR definition that, in its original form, would not have paid out a single dollar in profit participation to Plaintiffs. Unsurprisingly, AMC's MAGR definition has spurred disputes with the creative talent on *The Walking Dead* that ultimately resulted in litigation. In July 2021, AMC publicly disclosed that it paid Frank Darabont and Creative Artists Agency ("CAA") $200 million to settle their lawsuits over the proper calculation of their own MAGR interests in *The Walking Dead* ("the Darabont Settlement"). This settlement necessarily represents monies paid on account of Darabont's and CAA's MAGR interests, as those interests were the

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 2:22-cv-09101-FLA-AJRx

basis for Darabont and CAA's damage claims in the litigation. Because Plaintiffs' MFN Rights entitle them to the same treatment afforded to Darabont with respect to his MAGR interests, Plaintiffs are therefore entitled to have the same valuation applied to their MAGR interests, which, collectively, exceed Darabont's and CAA's. As a result, Plaintiffs are entitled to a payment well over $200 million from AMC, in an amount to be proved at trial.

3.    Despite its obligation to provide Plaintiffs with the same level of compensation attributable to Darabont's MAGR interest, AMC has refused to do so. To add insult to injury, AMC has charged costs attributable to the Darabont Settlement against the amounts payable on Plaintiffs' profit participation statements, establishing that the amounts payable to Darabont as part of the settlement were part of his compensation with respect to his services.

4.    Tellingly, AMC has recognized its MFN obligations arising out of the Darabont Settlement to at least one profit participant. Specifically, AMC agreed to pay ███████████████████ expressly as a result of the Darabont Settlement ("the ███ MFN Agreement"). AMC has also paid ███████████████ as advances on just a portion of his MAGR interest in *The Walking Dead* ("the ██████ Advances"). This exceeds any value per point that Plaintiffs have ever been paid on the Series.

**THE PARTIES**

**I.    Plaintiffs and Related Persons and Entities**

**A.    Plaintiffs**

5.    Plaintiff Robert Kirkman resides in Los Angeles County, California. Kirkman is a *New York Times* best-selling comic book writer and a television writer and producer. Kirkman created and wrote the popular original comic book, "The Walking Dead," which won an Eisner Award for best continuing series in 2010. "The Walking Dead" was adapted into the hugely successful television series of the same name and exploited to form the basis of several off shoots including *The Talking Dead*, *Fear the*

SULLIVAN &
TRIGGS, LLP
Attorneys at Law
Santa Monica

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 2:22-cv-09101-FLA-AJRx

*Walking Dead*, *The Walking Dead: World Beyond, Tales of the Walking Dead*, *The Walking Dead: Dead City*, *The Walking Dead Origins*, and at least two untitled spinoffs. Kirkman is also an executive producer of *The Walking Dead*, a writer and executive producer of *Fear the Walking Dead*, and a producer on the various derivative series.

6.    Plaintiff Robert Kirkman LLC is a limited liability company organized and existing under the laws of Kentucky with its principal place of business in California. Robert Kirkman LLC furnishes the writing, producing, and related services of Robert Kirkman in connection with television projects, including his work on *The Walking Dead* and *Fear the Walking Dead*. Robert Kirkman and Robert Kirkman LLC are collectively referred to herein as "Kirkman."

7.    Plaintiff Gale Anne Hurd resides in Los Angeles County, California. She is an American film and television producer and has produced multiple Academy and Emmy Award winning films and series. She has served as an executive producer of *The Walking Dead* since the Series' inception and is also an executive producer on *Fear the Walking Dead and Tales of the Walking Dead.*

8.    Plaintiff Valhalla Entertainment, Inc. (f/k/a Valhalla Motion Pictures, Inc.) is a corporation organized and existing under the laws of California with its principal place of business also in California. Valhalla furnishes the producing and related services of Gale Anne Hurd in connection with film and television projects, including her work on *The Walking Dead* and *Fear the Walking Dead*. Gale Anne Hurd and Valhalla are collectively referred to herein as "Hurd."

9.    Plaintiff David Alpert resides in Los Angeles County, California. He is an American television producer and the longtime manager and business partner of Robert Kirkman. He has served as an executive producer of *The Walking Dead* since its inception and has also served as an executive producer of *Fear the Walking Dead* and *Tales of the Walking Dead*.

10.    Plaintiff Circle of Confusion Productions LLC is a limited liability company organized and existing under the laws of California with its principal place of business also in California. David Alpert is affiliated with Circle of Confusion Productions which furnishes the producing and related services of David Alpert in connection with television projects, including his work on *The Walking Dead*, *Fear the Walking Dead*, and *Tales of the Walking Dead*.

11.    Plaintiff New Circle of Confusion Productions, Inc. is a corporation organized and existing under the laws of California with its principal place of business also in California. New Circle of Confusion Productions, Inc. is the successor-in-interest to Circle of Confusion Productions LLC with respect to Alpert's executive producer services for *Fear the Walking Dead*. David Alpert, Circle of Confusion Productions LLC, and New Circle of Confusion Productions, Inc. are collectively referred to herein as "Alpert."

12.    Plaintiff Charles Eglee resides in Los Angeles County, California. In addition to numerous industry award nominations, Eglee earned an Emmy Award for his work on *NYPD Blue* and a Peabody Award for his work on *The Shield*. Eglee served as a writer and executive producer of *The Walking Dead* during its highly successful first season.

13.    Plaintiff United Bongo Drum, Inc. is a corporation organized and existing under the laws of California with its principal place of business also in California. United Bongo Drum furnishes the writing, producing, and related services of Charles Eglee in connection with television projects, including his work on *The Walking Dead*. Charles Eglee and United Bongo Drum are collectively referred to herein as "Eglee."

14.    Plaintiff Glen Mazzara resides in Los Angeles County, California. He is an American film and television producer and writer. He served as a writer for *The Walking Dead* during 2010 and served as executive producer and showrunner of *The Walking Dead* between 2011 and 2012.

SULLIVAN & TRIGGS, LLP
Attorneys at Law
Santa Monica

15.    Plaintiff 44 Strong Productions, Inc. is a corporation organized and existing under the laws of California with its principal place of business also in California. 44 Strong furnishes the writing, producing, and related services of Glen Mazzara in connection with film and television projects, including his work on *The Walking Dead*. Glen Mazzara and 44 Strong are collectively referred to herein as "Mazzara."

## II.    Defendants

16.    **AMC Parent**—Defendant AMC Networks, Inc. is a vertically integrated media conglomerate with dozens of indirectly and directly owned subsidiaries including its co-Defendants AMC Network Entertainment LLC and AMC Film Holdings LLC. AMC Networks, Inc. is referred to throughout as "AMC Parent."

17.    AMC Parent is a publicly owned corporation organized and existing under the laws of Delaware with its principal place of business in New York. AMC Parent and its subsidiaries regularly conduct business in California and have hundreds of employees based there.

18.    **AMC Studio**—Defendant AMC Film Holdings LLC is a limited liability corporation organized and existing under the laws of Delaware with its principal place of business in New York. AMC Film Holdings LLC is referred to throughout as "AMC Studio." AMC Studio is a directly or indirectly owned subsidiary or affiliate of Defendants AMC Parent and AMC Network and is the successor-in-interest to each of the disputed contracts.

19.    **AMC Network**—Defendant AMC Network Entertainment LLC is a limited liability corporation organized and existing under the laws of Delaware with its principal place of business in New York. AMC Network was formerly known as "American Movie Classics Company LLC." AMC Network exhibits television programming, including *The Walking Dead* and *Fear the Walking Dead*.

20.    AMC Parent, AMC Studio, and AMC Network are referred to collectively as AMC or Defendants.

## III. Related Persons and Entities

21. **Stu Segall Productions**—Stu Segall Productions, Inc. is a production service company used by AMC to produce the series in accordance with applicable Guild agreements. TWD Productions LLC, an AMC subsidiary, hired Stu Segall Productions, Inc. to provide production services for *The Walking Dead*. Specifically, AMC Network, then operating as American Movie Classics Company LLC, and TWD Productions LLC contracted with Stu Segall Productions, Inc. to secure top talent, including Plaintiffs and Darabont, to create the series. Accordingly, Stu Segall Productions is the original signatory to several of Plaintiffs' agreements. Stu Segall Productions is a corporation organized under the laws of California with its principal place of business also in California. Stu Segall Productions, Inc. is affiliated with Stalwart Films LLC. Stalwart Films LLC played a role like Stu Segall Production's in the production of later seasons. In 2018, AMC purchased Stalwart Films from Stu Segall Productions, Inc.

22. **Frank Darabont**—Frank Darabont developed *The Walking Dead* for AMC, wrote and directed the pilot episode, and served as an executive producer and showrunner during its first season and first seven episodes of its second season. Ferenc, Inc. and Darkwoods Productions, Inc., both corporations organized and existing under the laws of California with their principal place of business in California, are Darabont's loan out corporations. Frank Darabont, Ferenc, and Darkwoods are collectively referred to herein as "Darabont."

23. ███████████████████████████████████████
████████████████████████████████

## JURISDICTION AND VENUE

24. This Court has original jurisdiction over this action under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Defendants, which are citizens of Delaware and New York, and Plaintiffs, who are citizens of California, and

SULLIVAN &
TRIGGS, LLP
Attorneys at Law
Santa Monica

the amount in controversy as to each Plaintiff exceeds $75,000, exclusive of interest and costs.

25.    Venue is proper Under 28 U.S.C. § 1441(a) because the United States District Court for the Central District of California is the federal judicial district embracing the Los Angeles County Superior Court, where Plaintiffs originally filed suit before Defendants removed the case to federal court. 28 U.S.C. § 84(a).

## STATEMENTS OF CLAIMS

## I.    Factual Background

### A. Plaintiffs sign contracts with AMC for *The Walking Dead* and *Fear The Walking Dead*.

26.    In November 2009, AMC signed a literary option purchase agreement with Robert Kirkman to obtain the television rights to Kirkman's successful comic book "The Walking Dead." Over the next several months, Stu Segall Productions, acting on AMC's behalf, contracted with Frank Darabont, Gale Anne Hurd, Chic Eglee, and David Alpert and their loan out companies to direct, produce, and write for *The Walking Dead*.

27.    Those contracts entitled Hurd, Kirkman, Alpert, and Eglee to contingent compensation for *The Walking Dead* as follows:

        a.    Kirkman is entitled to 5% of 100% of MAGR.

        b.    Hurd is entitled to 7.5% of 100% of MAGR.

        c.    Alpert is entitled to 2.5% of 100% of MAGR.

        d.    Eglee is entitled to 2.375% of 100% of MAGR.

For Kirkman, Hurd, and Alpert, each of these MAGR interests vested one-quarter at a time, with the first three-quarters vesting by the end of the first season in 2010 and the last quarter vesting at the conclusion of the second season. Ex. A § 11.c, Ex. B § 4.c, Ex. C § 4.c, Ex. D § 7.b. Eglee's MAGR interest vested at 2.375% pursuant to an agreement dated December 16, 2010. ████████, Frank Darabont, and CAA are also entitled to a percentage of MAGR for *The Walking Dead*.

SULLIVAN &
TRIGGS, LLP
Attorneys at Law
Santa Monica

28.    Each of Plaintiffs' contracts entitle them to most favored nation or MFN status with respect to the payment of contingent compensation arising from *The Walking Dead*:

a.    Kirkman's contract states that "in no event shall MAGR be defined, computed, or paid on a basis less favorable than for any other non-cast individual participant on the Series." Ex. A § 11(b)(iii).

b.    Hurd's contract states that "in no event shall Artist's MAGR participation be defined less favorably than the MAGR definition accorded to the Author, Writer, director or any other individual executive producer on the Series." Ex. B § 4(d)(iii).

c.    Alpert's contract states that "in no event shall Artist's MAGR participation be defined less favorably than the MAGR definition accorded to the Author or any other individual executive producer on the Series." Ex. C § 4(d)(iv).

d.    Eglee's contract states that MAGR shall be "defined, computed, and paid in accordance with the definition thereof applicable to Frank Darabont and Gale Anne Hurd in connection with the Series." Ex. D § 7(c).

29.    Glen Mazzara signed an initial contract with Stu Segall for his producing and writing services with an effective date of February 2, 2011. Ex. E. He signed a settlement agreement dated December 20, 2012, that secured him the right to 1.5% of 100% of MAGR for *The Walking Dead.* Ex. F. The December 20, 2012 agreement states that "in no event shall the MAGR participation hereunder be defined, calculated or accounted for … less favorably than the MAGR definition accorded to any other individual rendering services on the Series." Ex. F § 3(b).

30.    Pursuant to industry custom and usage, Plaintiffs' MFN Rights guarantee that they will be treated equally with other profit participants. The upshot of these rights pursuant to industry custom and usage is that when another profit participant exercises their own leverage—whether that leverage exists because of, among other things, the

SULLIVAN & TRIGGS, LLP
Attorneys at Law
Santa Monica

network's needs, the participant's stature, or litigation—to improve how their MAGR is defined, calculated, or paid, Plaintiffs are entitled to the same improvements. In other words, securing MFN rights allow a profit participant to later reap the benefits of other profit participants' efforts without any additional action of their own. For that reason, MFN rights are an extremely valuable benefit that AMC is loath to agree to but did for Plaintiffs in recognition of their value to the Series.

31.    As AMC well knows, contract terms that a profit participant will have their MAGR defined, calculated, computed, accounted for, or paid on as favorable a basis as any other participant have a well-established usage and special meaning in the entertainment industry to mean that a profit participant will have their MAGR paid on the same value, MAGR point for MAGR point, as other profit participants, whether or not those other profit participants (like Darabont) were forced to pursue litigation to obtain their more favorable treatment. AMC is aware of this special meaning as it is an entertainment company that was represented and run by experienced entertainment executives and attorneys at all times relevant to this litigation. That is why AMC gave Plaintiffs the benefit of improvements to how Darabont's MAGR was calculated and paid based on his contract. Its why AMC gave Plaintiffs the benefit of improvements to how Darabont's MAGR was calculated and paid in a futile attempt to avoid litigation. And it is why they are required to give Plaintiffs the benefit of improvements to how Darabont's MAGR was paid to avoid a jury trial.

**B.    Despite *The Walking Dead*'s historic success, AMC imposes a MAGR definition that leads to litigation.**

32.    The first season of *The Walking Dead* premiered on AMC Network on Halloween in 2010. The six-episode season concluded on December 5, 2010.

33.    This first season was hugely successful. The premiere was the most watched in AMC Network history and the highest rated in all of cable in 2010. The Series continued its historic success. *The Walking Dead* was "the first cable series to become the

SULLIVAN & TRIGGS, LLP
Attorneys at Law
Santa Monica

#1 show in all of television including broadcast, a rank it held for five consecutive years." When asked who was responsible for *The Walking Dead*'s success, Joel Stillerman, AMC's former President of Original Programming, replied: "Robert Kirkman would be … the first person that would come to mind." He also credited Plaintiffs Gale Anne Hurd and David Alpert, as well as the other producers and writers, who include Frank Darabont and Plaintiffs Chic Eglee and Glen Mazzara, for the Series' success.

34.     Because of this unprecedented success, AMC has made billions from *The Walking Dead* franchise. Yet, when AMC Studios issued a MAGR definition to Plaintiffs in March 2011—with full knowledge of the first season's historic success—it unilaterally imposed financial terms so unfair and so far outside industry norms that the definition would not have yielded a penny of contingent compensation for the profit participants involved in *The Walking Dead* notwithstanding the historic success of the Series.

35.     Unsurprisingly, the profit participants on *The Walking Dead* protested AMC's MAGR definition and its extreme terms. Darabont and CAA were able to achieve some limited concessions from AMC through negotiation, which were applied to Plaintiffs through the MFN provisions in their contract. Ultimately, however, AMC proved unreasonable and unwilling to negotiate the most financially significant issue with its MAGR definition—namely its license fee for AMC Network's broadcast of *The Walking Dead* domestically.

36.     Frank Darabont and CAA sued AMC Studio and related corporations in New York state court in December 2013. According to their complaint, the lawsuit arose from "the unabated effort of a television conglomerate (AMC) to deprive Frank Darabont—the artist who created, wrote, directed, and produced the television series *The Walking Dead*—of his contractual entitlement to profits from the series." Darabont and CAA filed a related suit in 2018.

37.     The Darabont/CAA lawsuits centered on AMC's definition and calculation of contingent compensation. They took issue with AMC's accounting methodology and

with the distribution fees AMC has charged. But the gravamen was that AMC defined and accounted for each profit participant's contingent compensation improperly, in breach of both its express and implied contractual obligations, by unilaterally setting the license fee for AMC Network's broadcast of the series at levels that would produce little or no contingent compensation.

**C.    AMC treats ███████ more favorably than Plaintiffs.**

38.    Through a series of contracts, ███████ was entitled to ███ MAGR points for *The Walking Dead* and ███ MAGR points for *Fear the Walking Dead*.

39.    In January 2018, ███████ and AMC signed an agreement in which AMC agreed that ███████ "MAGR definition on each of [*The Walking Dead*] and [*Fear the Walking Dead*] shall be MFN with the definitions accorded to other participants on each of the respective series (i.e., the dollar value of one … point on the respective Series shall be no less than the dollar value of a point on such Series granted to anyone else."

40.    Unbeknownst to Plaintiffs, in that same contract, AMC agreed to pay ███ ███████ to ███████ as advances on ██ MAGR points for *The Walking Dead*. The Advances, amounting to ███████ per point, exceed any value per point that AMC has ever paid Plaintiffs.

41.    In an agreement signed in early 2018 but dated August 30, 2017, and also unbeknownst to Plaintiffs, AMC and ███████ further agreed to "to interpret the MFN in connection with ███████ MAGR interest in [*The Walking Dead*] … to provide ███████ with the benefit of any final, non-appealable judgments, settlement payments, or other consideration of any kind including but not limited to MAGR definition changes resulting from the Existing Lawsuits made in favor of any plaintiff … adjusted to reflect ███████ share of MAGR on the Series. For the sake of clarity and by way of example only, if ███████ has ██ of MAGR on 'The Walking Dead' and … Hurd … has 2%, and Hurd settles any one or more of the Existing Lawsuits for a sum of which Hurd's allocable share is $10,000, then ███████ would receive $5,000."

SULLIVAN & TRIGGS, LLP
Attorneys at Law
Santa Monica

### D.    AMC settles its litigation with Darabont and CAA.

42.    For several years, both lawsuits in New York were litigated vigorously. But on July 16, 2021, AMC reached a settlement agreement with Darabont and CAA ending their litigation over AMC's accounting practices and license fee. AMC Network announced the settlement in a Form 8-K report filed that date with the Securities and Exchange Commission:

> On July 16, 2021, the Company entered into a settlement agreement (the "Settlement Agreement") with Frank Darabont, Ferenc, Inc., Darkwoods Productions, Inc., and Creative Artists Agency, LLC (together, the "Plaintiffs") in actions brought in connection with Frank Darabont's rendering services as a writer, director and producer of the television series entitled The Walking Dead. The consolidated cases were initially brought in 2013 and 2018 and the trial of the consolidated cases was scheduled to commence on April 4, 2022. See Note 15, "Commitments and Contingencies" to the condensed consolidated financial statements included in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 for a further description of this and other legal proceedings involving the Company.

> The Settlement Agreement provides for a cash payment of $200 million (the "Settlement Payment") to the plaintiffs and future revenue sharing related to certain future streaming exhibition of The Walking Dead and Fear The Walking Dead. With regard to the Settlement Payment, the Company has taken a charge of approximately $143 million in the quarter ended June 30, 2021 in consideration for the extinguishment of Plaintiffs' rights to any compensation in connection with The Walking Dead and any related programs and the dismissal of the actions with prejudice, which amount is net of approximately $57 million of ordinary course accrued participations.

> The Settlement Agreement also includes customary provisions included in such agreements, including providing for mutual releases, covenants not to sue, waivers, confidentiality, non-disparagement and indemnification for third party claims.

AMC Network, Inc., Form 8-K (July 16, 2021), accessed at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001514991/000151499121000034/amcx-20210716.htm.

43.    In a press release dated August 6, 2021, AMC stated the following about the settlement:

> On July 16, 2021, the Company entered into a settlement agreement (the "Settlement Agreement") with Frank Darabont, Ferenc, Inc., Darkwoods Productions, Inc., and Creative Artists Agency, LLC (together, the

SULLIVAN & TRIGGS, LLP
Attorneys at Law
Santa Monica

"Plaintiffs") in actions brought in connection with Frank Darabont's rendering services as a writer, director and producer of the television series entitled The Walking Dead. The consolidated cases were initially brought in 2013 and 2018 and the trial of the consolidated cases was scheduled to commence on April 4, 2022. The Settlement Agreement provides for a cash payment of $200 million (the "Settlement Payment") to the Plaintiffs and future revenue sharing related to certain future streaming exhibition of The Walking Dead and Fear The Walking Dead. With regard to the Settlement Payment, the Company recorded a charge of $143.0 million, included in Impairment and Other Charges in consideration for the extinguishment of Plaintiffs' rights to any compensation in connection with The Walking Dead and any related programs and the dismissal of the actions with prejudice, which amount is net of $57.0 million of ordinary course accrued participations.

AMC Network, "AMC Networks Inc. Reports Second Quarter 2021 Results," (Aug 6. 2021), accessed at https://www.amcnetworks.com/press-releases/amc-networks-inc-reports-second-quarter-2021-results/.

44.    In January 2022, AMC Studio issued profit participation statements to Plaintiffs for *The Walking Dead*. On those statements, AMC noted the following:

The "Insurance, Permits and Other Distribution Costs" line includes a current period charge of $19,823,573, the portion of the recent litigation settlement which would have been paid to settling plaintiffs pursuant to future statements and payments regarding the Series.

The amount is on that line in the statement because that is where legal expenses reside. Absent the litigation and settlement, that amount (in the aggregate) would have appeared over time on the "Deferments & Percentage Participations" line item as statements were issued and paid.

As always, the company reserves the right to modify statements as needed to give effect to year-end adjustments made by company's accounting department or public accountants, or to items overlooked, to correct errors, or for any other purposes.

The statements do not reflect any payments of any kind to Plaintiffs, and do not reflect MFN treatment of any portion of AMC's settlement with Darabont and CAA. Kirkman's, Hurd's, and Alpert's *Fear the Walking Dead* statements for the same period each include the following:

The "Insurance, Permits and Other Distribution Costs" line includes a current period charge of $18,828,997, the portion of the recent litigation settlement which would have been paid to settling plaintiffs pursuant to future statements and payments regarding the Series.

SULLIVAN & TRIGGS, LLP
Attorneys at Law
Santa Monica

> The amount is on that line in the statement because that is where legal expenses reside. Absent the litigation and settlement, that amount (in the aggregate) would have appeared over time on the "Deferments & Percentage Participations" line item as statements were issued and paid.

Again, Plaintiffs' *Fear the Walking Dead* profit participation statements do not reflect any payments of any kind to Plaintiffs and do not reflect MFN treatment of AMC's settlement with Darabont and CAA.

45.    In other words, in a litigation over what AMC's MAGR definition should have properly generated in proceeds for the profit participants with an interest in those proceeds, AMC agreed: (i) to attribute a value to Darabont's and CAA's MAGR interests in the amount of at least $200 million, well above any value given to Plaintiffs; (ii) to include additional revenue as payment for streaming of the series; and (iii) to make immediate payment on Darabont's and CAA's future MAGR interests. AMC then charged (i.e., deducted) costs from this settlement to AMC's accounting of amounts due to Plaintiffs, establishing that the settlement was a cost attributable to the production of the Series, and not some independent investment decision made by AMC to purchase a financial asset belong to someone else. Yet, AMC has failed to honor its contractual obligations to treat Plaintiffs in the same manner and on the same timeline as Darabont.

**E.    AMC gives ████ MFN treatment based on the Darabont settlement and conceals that fact from Plaintiffs.**

46.    In January 2022, after AMC settled with Darabont, AMC and ████ signed an NDA that specifically stated that ████ could not share any information with Plaintiffs about either the Darabont Settlement or about the application of his MFN rights to the Darabont Settlement.

47.    Approximately one month later, AMC transmitted the Darabont Settlement to ████ and offered, on a confidential basis, to pay ████ million pursuant to MFN rights to the Darabont Settlement.

48.    In September 2022, AMC and ████ ultimately agreed that AMC would pay ████ million pursuant to his MFN to the Darabont Settlement in return for

SULLIVAN & TRIGGS, LLP
Attorneys at Law
Santa Monica

██████ release of any further right to contingent compensation in *The Walking Dead* and *Fear the Walking Dead*.

49.    Only after Plaintiffs notified AMC of their intent to pursue an MFN claim against AMC based on the Darabont Settlement, AMC included in the September 2022 agreement the language that "nothing in this Buyout Agreement or otherwise constitutes any modification of the definition, computation, calculation, accounting, or payment of Modified Adjusted Gross Receipts for ██████ in connection with contingent compensation associated with [*The Walking Dead*] and [*Fear the Walking Dead*]." AMC also again required ██████ to agree that ██ would not share any information about the payout with Plaintiffs or their attorneys.

50.    AMC never informed Plaintiffs of the above-described agreements with ██████ or payments to ██████ as required by Plaintiffs' MFN Rights. Plaintiffs only learned of the ██████ MFN Agreement through discovery.

51.    AMC has not offered, or made, any payment to Plaintiffs pursuant to their MFN to ██████ in violation of AMC's obligations under Plaintiffs' MFN Rights.

## FIRST CAUSE OF ACTION

### By All Plaintiffs against All Defendants

### Breach of Contract – *The Walking Dead* (Based on the Darabont Settlement)

52.    Plaintiffs repeat, reallege, and incorporate all preceding paragraphs as though fully set forth.

53.    Plaintiff has fully performed all their obligations under the contracts entitling them to contingent compensation arising from *The Walking Dead* and the MFN treatment relating to that contingent compensation.

54.    Plaintiffs' contracts entitle them each to most favored nation treatment with Darabont in defining, calculating, and paying contingent compensation.

55.    MFN treatment is a significant contractual right because it guarantees that a profit participant entitled to that benefit will obtain the best (most lucrative) treatment

SULLIVAN & TRIGGS, LLP
Attorneys at Law
Santa Monica

afforded to any other profit participant without condition. Here, Darabont and CAA negotiated with AMC for years before suing in 2013 and then again in 2018 to obtain payment due and owing on their MAGR definitions applicable to TWD and FTWD. Darabont and CAA settled their claims based on the same contractual rights asserted by Plaintiffs in the California litigation for hundreds of millions in payments, and rights to streaming revenue. Under their agreements with AMC, Plaintiffs are now entitled to receive the same treatment obtained by Darabont.

56. Because of Plaintiffs' MFN Rights, AMC is obligated, at a minimum, to:

a. Pay each Plaintiff an amount proportionally equivalent to the value attributable to MAGR given to Darabont in the $200 million settlement;

b. Provide each Plaintiff with the benefit of immediate pay out of their not yet accrued MAGR interests; and

c. Give Plaintiffs the benefits of any additional licensing revenue for streaming of *The Walking Dead*.

57. By refusing to do any of these things, AMC has breached its contract with Plaintiffs for *The Walking Dead*.

58. As a result of AMC's breach, Plaintiffs have been damaged in amount to be proven at trial, but which Plaintiffs are informed and believe exceed $200 million.

## SECOND CAUSE OF ACTION

### By All Plaintiffs against All Defendants

### Breach of Contract – *The Walking Dead* (Based on the ███████ Advances and the ███████ MFN Agreement)

59. Plaintiffs repeat, reallege, and incorporate all preceding paragraphs as though fully set forth.

60. Plaintiffs have fully performed all their obligations under the contracts entitling them to contingent compensation arising from *The Walking Dead* and the MFN treatment relating to that contingent compensation.

SULLIVAN & TRIGGS, LLP
Attorneys at Law
Santa Monica

61.    ████ secured in his 2018 overall agreement a right to be paid a minimum of $████ per MAGR point in the form of advances. AMC paid ████ $████ based on that agreement. In 2022, AMC also agreed to pay ████ $████ in exchange for a release of ████ MAGR points in *The Walking Dead* and ██ MAGR points in *Fear the Walking Dead*, which represents a payment of over ███ million per MAGR point. Combined, through the ████████████, AMC has paid or agreed to pay ████████ for each MAGR point in *The Walking Dead*.

62.    Plaintiffs' MFN Rights apply to amounts of MAGR paid to ████ AMC is obligated, at a minimum, to:

> a.  Pay Plaintiffs $3.25 million per point as advances; and

> b.  Pay Plaintiffs $3.9 million per point as a buyout payment.

63.    By failing to do either of these things, AMC has breached its contract with Plaintiffs for *The Walking Dead*.

64.    As a result of AMC's breach of Plaintiffs' MFN Rights based on the more favorable treatment it has provided ████, Plaintiffs have been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### By Plaintiffs Hurd, Kirkman, and Alpert against All Defendants

### Breach of Contract – *Fear the Walking Dead* (Based on the Darabont Settlement, the ████ Advances, and the ████ MFN Agreement)

65.    Plaintiffs repeat, reallege, and incorporate all preceding paragraphs as though fully set forth.

66.    Plaintiff has fully performed all their obligations under the contracts entitling them to contingent compensation arising from *Fear the Walking Dead* and the MFN treatment to *The Walking Dead* relating to that contingent compensation.

SULLIVAN & TRIGGS, LLP
Attorneys at Law
Santa Monica

67.    Kirkman's, Hurd's, and Alpert's contracts entitle them each to contingent compensation on *Fear the Walking Dead*:

      a.    Kirkman is entitled to 12.5% of 100% of MAGR.

      b.    Hurd is entitled to 7.5% of 100% of MAGR.

      c.    Alpert is entitled to 2.5% of 100% of MAGR.

68.    ███████ was also entitled to contingent compensation on *Fear the Walking Dead*. Through a series of contracts, ███████ was entitled to ██████ of MAGR.

69.    Kirkman's, Hurd's, and Alpert's *Fear the Walking Dead* contracts entitle them each to have their contingent compensation for *Fear the Walking Dead* treated identically as their contingent compensation for *The Walking Dead*. AMC has acknowledged that these contractual provisions give Kirkman, Hurd, and Alpert MFN rights with respect to their contingent compensation on *The Walking Dead*. AMC said so to Plaintiffs when negotiating their contracts, and admitted that fact in affidavits and pleadings it has submitted in the California litigation.

70.    Kirkman, Hurd, and Alpert are entitled to the same MAGR definition on *The Walking Dead* and *Fear the Walking Dead.* As a result, AMC's obligation to pay Kirkman, Hurd, and Alpert a higher value for their MAGR interests on *The Walking Dead* (in accordance with their MFN rights based on the Darabont Settlement, the ██████ Advances, and the ███████ MFN Agreement) requires AMC to adjust the value of Plaintiffs' *Fear the Walking Dead* MAGR interests in accordance with the measure of MAGR used as the basis for the Darabont Settlement, the ███████ Advances, and the ███████ MFN Agreement.

71.    By also failing to comply with this obligation, AMC has breached its contracts with Kirkman, Hurd, and Alpert for *Fear the Walking Dead* as well, causing damages in an amount to be established at trial.

SULLIVAN &
TRIGGS, LLP
Attorneys at Law
Santa Monica

## FOURTH CAUSE OF ACTION

### By All Plaintiffs against All Defendants

### Breach of Implied Covenant of Good Faith and Fair Dealing

72.     Plaintiffs repeat, reallege, and incorporate all preceding paragraphs as though fully set forth.

73.     As alleged above, AMC breached Plaintiffs' contracts by failing to provide Plaintiffs the same financial benefits afforded to Darabont and/or ████ with respect to Darabont and ████ rights to MAGR from *The Walking Dead* and *Fear the Walking Dead*.

74.     Alternatively—if Plaintiffs' MFN Rights are determined not to extend to the Darabont Settlement and the ████ MFN Agreement—then AMC breached the implied covenant of good faith and fair dealing by structuring those agreements to reach this result.

75.     Plaintiffs' *The Walking Dead* and *Fear the Walking Dead* contracts, like all contracts, include an implied covenant of good faith and fair dealing. The implied covenant protects Plaintiffs' reasonable expectations regarding the scope of Plaintiffs' MFN Rights.

76.     Here, Plaintiffs reasonably expected that by negotiating for and securing the right to have their MAGR paid, defined, calculated, and accounted for as favorably as Darabont and ████ that AMC had a mandatory, non-discretionary obligation to provide Plaintiffs the same level of compensation obtained by Darabont and ████ based on their MAGR interests. Plaintiffs also reasonably expected that AMC would not take action to structure compensation attributable to Darabont's or ████ MAGR interests in a manner that avoided triggering Plaintiffs' MFN Rights.

77.     AMC structured its agreements with Darabont and ████ in a manner designed to deprive Plaintiffs of the benefits of their MFN rights. First, AMC structured its payment to Darabont on his MAGR interests to try to avoid its potential liability to Plaintiffs by characterizing the payment as a "buyout" and including other non-essential language in the Darabont Settlement designed to create a defense specifically to Plaintiffs'

SULLIVAN & TRIGGS, LLP
Attorneys at Law
Santa Monica

assertion of their MFN rights. AMC—after being informed of Plaintiffs' intent to pursue their MFN rights to the Darabont Settlement—then structured the ███ MFN Agreement as a "buyout" and again included other non-essential language designed to create a defense to an assertion of Plaintiffs' MFN Rights based on the more favorable treatment afforded to ███ Specifically, even though AMC paid ████████ pursuant to ███ MFN rights, which had guaranteed that ███ MAGR would be defined as favorably as any other profit participant, in exchange for ███ release of those MAGR rights, AMC inserted self-serving language into the ███ MFN Agreement claiming that the ███ payment did not change the way MAGR was paid, defined, or accounted for.

78.    AMC furthered its efforts to avoid Plaintiffs' MFN rights by using confidentiality agreements to conceal the fact of, and details relating to, its agreements with Darabont and ███ from Plaintiffs. AMC's concealment of those agreements further breached AMC's obligations to inform Plaintiffs of payments to other profit participants consistent with Plaintiffs' reasonable expectations based on their MFN rights.

79.    By, in the alternative, breaching the implied covenant of good faith and fair dealing in the manner alleged above, AMC has breached its contracts with Plaintiffs, causing damages in an amount to be established at trial.

### PRAYER FOR RELIEF

80.    **WHEREFORE**, Plaintiffs pray for judgment against each Defendant as follows:

a.    For actual and compensatory damages in an amount to be determined at the trial of this action, but which Plaintiffs are informed and believe will be in excess of $200 million;

b.    For costs of suit and such other and further relief as this Court may deem just and proper.

SULLIVAN &
TRIGGS, LLP
Attorneys at Law
Santa Monica

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this amended complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Date:  January 24, 2025

Respectfully submitted,

SULLIVAN & TRIGGS, LLP

By: _____/s/ Sheldon Eisenberg_____
Sheldon Eisenberg
Courtney Elgart
Jean Ralph Fleurmont
Stephanie Command

Attorneys for Plaintiffs

SULLIVAN &
TRIGGS, LLP
Attorneys at Law
Santa Monica

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Date: January 24, 2025

Respectfully submitted,

SULLIVAN & TRIGGS, LLP

By: _____*/s/ Sheldon Eisenberg*_____
Sheldon Eisenberg
Courtney Elgart
Jean Ralph Fleurmont
Stephanie Command

Attorneys for Plaintiffs