GIBSON, DUNN & CRUTCHER LLP
ORIN SNYDER (*pro hac vice*)
  osnyder@gibsondunn.com
BRIAN C. ASCHER (*pro hac vice*)
  bascher@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

ILISSA SAMPLIN, SBN 314018
  isamplin@gibsondunn.com
DANIEL NOWICKI, SBN 304716
  dnowicki@gibsondunn.com
MARISSA MULLIGAN, SBN 319734
  mmulligan@gibsondunn.com
333 S Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Robert Kirkman, et. al<br><br>                    Plaintiffs,<br>vs.<br><br>AMC Film Holdings LLC, et. al<br><br>                    Defendants. | CASE NO. 2:22-cv-09101-FLA-AJR<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[FED. R. CIV. P. 56]**<br><br>**REDACTED VERSION PROPOSED TO BE FILED UNDER SEAL**<br><br>Judge:          Hon. Fernando L. Aenlle-Rocha<br><br>Complaint Filed: November 14, 2022<br><br>FAC Filed:      February 25, 2025<br><br>Hearing Date:   January 9, 2026<br><br>Time:           1:30 p.m.<br><br>CTRM:           6B |

## NOTICE OF MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on January 9, 2026 at 1:30 p.m., or as soon as this matter may be heard, before the Honorable Fernando L. Aenlle-Rocha, in Courtroom 6B of the above-entitled court located at 350 W. 1st Street, Los Angeles, CA, 90012, Defendants AMC Film Holdings LLC, AMC Network Entertainment LLC, and AMC Networks Inc. ("AMC"), will and hereby do move the Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment as to all claims asserted in Plaintiffs' First Amended Complaint, Dkt. 100.   This Motion is made on the following grounds:

**Counts 1 and 2**: Plaintiffs claim three of AMC's transactions with third parties entitle Plaintiffs to more compensation ("Modified Adjusted Gross Receipts" or "MAGR"), pursuant to the Most Favored Nations ("MFN") provisions in their contracts with AMC for *The Walking Dead*.  The claims fail because:

    a. Under the unambiguous language of Plaintiffs' contracts, their MFNs are triggered *only* by changes to the governing "MAGR definition." It is undisputed the three transactions Plaintiffs challenge did not change the MAGR definition.

    b. Even if extrinsic evidence were admissible to interpret Plaintiffs' MFNs (and it is not, because the MFNs are unambiguous) none supports Plaintiffs' interpretation.

    c. Plaintiffs' interpretation of their MFNs would render their contracts indefinite and therefore unenforceable under governing New York law.

**Count 3**: Plaintiffs Kirkman, Alpert, and Hurd's claim three of AMC's transactions with third-parties breached their contracts with AMC for the series *Fear the Walking Dead*.  The claims fail because:

    a. Under the unambiguous language of Plaintiffs' *Fear* contracts, they are only entitled to the MAGR definition used on *The Walking Dead*. It is

Gibson, Dunn &
Crutcher LLP

undisputed that AMC never created a new MAGR definition for *The Walking Dead* in connection with the third-party transactions at issue.

b. It is undisputed—and Plaintiffs are collaterally estopped from disputing—that Plaintiffs' *Fear* contracts do not contain MFNs.

**Count 4**: Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails because:

a. The claim is duplicative of Counts 1 and 2.

b. The implied covenant cannot be used to introduce contradictory or novel terms to a contract.

c. There is no evidence AMC acted in bad faith or with reckless disregard for Plaintiffs' contractual rights.

This Motion for Summary Judgment is based on this Notice; the Memorandum of Points and Authorities in support of this Motion; the Statement of Uncontroverted Facts in support of this Motion; the Declaration of Ilissa Samplin in support of this Motion; the Request for Judicial Notice in support of this Motion; the concurrently lodged Proposed Judgment; and on such further evidence and argument that may be presented prior to or at the hearing of this Motion.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on October 28, 2025.  During that conference, the parties were unable to resolve the issues presented in this Motion.

Dated:  November 5, 2025          GIBSON, DUNN & CRUTCHER LLP


By:    */s/ Ilissa Samplin*
           Ilissa Samplin


*Attorneys for Defendants*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION .................................................................................................1

II.    BACKGROUND .................................................................................................4

       A.     **Plaintiffs Negotiate MFN Clauses Tied to the MAGR Definition** .........4

       B.     **Darabont/CAA Sue AMC** ..................................................................5

       C.     **Plaintiffs Sue AMC And Lose** ...........................................................6

       D.     **Darabont/CAA Settle** .....................................................................6

       E.     ███████  **Enters An MFN Amendment, Overall, and Buyout** ...............8

       F.     **Plaintiffs File This Suit** ...................................................................8

III.   LEGAL STANDARD .........................................................................................9

IV.    ARGUMENT......................................................................................................9

       A.     **Counts 1&2: The MFNs' Unambiguous Language Forecloses Plaintiffs' Contract Claims** .........................................................9

       B.     **Counts 1&2: No Extrinsic Evidence Supports Plaintiffs' Claims**.................14

       C.     **Counts 1&2: The Contracts Do Not Explain How To Apply The MFNs To These Transactions** .......................................15

       D.     **Count 3: Plaintiffs Have No MFNs on *Fear*** ......................................19

       E.     **Count 4: The Implied Covenant Claim Fails** ........................................20

V.     CONCLUSION ...............................................................................................21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Allen v. Robinson,*
2011 WL 5022819 (S.D.N.Y. Oct. 19, 2011) ............................................. 18

*Alter v. Bogoricin,*
1997 WL 691332 (S.D.N.Y. Nov. 6, 1997) ........................................... 16, 19

*Bandler v. BPCM,*
2014 WL 5038407 (S.D.N.Y. Sept. 29, 2014) ...................................... 18, 19

*Candid Prods., Inc. v. Int'l Skating Union,*
530 F.Supp. 1333 (S.D.N.Y. 1982) ......................................................... 16

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................... 9

*Cerveceria Modelo v. C.B. Brand Strategies,*
2023 WL 2185899 (S.D.N.Y. Feb. 23, 2023) ........................................... 13

*Compagnie Financiere v. Merrill Lynch,*
232 F.3d 153 (2d Cir. 2000) ...................................................................... 14

*Dish Network v. Ace Am. Ins.,*
21 F.4th 207 (2d Cir. 2021) ...................................................................... 10

*In re Enron,*
380 B.R. 307 (S.D.N.Y. 2008) .................................................................. 12

*Ferguson v. Lion Holding, Inc.,*
478 F.Supp.2d 455 (S.D.N.Y. 2007) ........................................................ 21

*Giray v. Ulukaya,*
181 N.Y.S.3d 93 (App. Div. 2023) ........................................................... 11

*Gutkowski v. Steinbrenner,*
680 F.Supp.2d 602 (S.D.N.Y. 2010) ........................................................ 18

*Holzer v. Kaplan,*
1991 WL 230623 (S.D.N.Y. 1991) ........................................................... 18

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,*
52 N.Y.2d 105 (1981) ......................................................... 3, 15, 16, 18

*Keene Corp. v. Bogan,*
1990 WL 1864 (S.D.N.Y. Jan. 11, 1990) ............................................ 21, 22

*Kirkman v. AMC Film Holdings LLC,*
2020 WL 4364279 (Cal. Super. Ct. July 22, 2020) .......................... 6, 11, 20

*Kirkman v. AMC Film Holdings LLC,*

2022 WL 22901585, at *13 (Cal. Super. Ct. Apr. 6, 2022).........................................6

*Kirkman v. AMC Film Holdings, LLC,*
2024 WL 4664181 (Cal. Ct. App., Nov. 4, 2024) ...................................6, 20

*L. Debenture Tr. v. Maverick Tube,*
595 F.3d 458 (2d Cir. 2010).................................................................9, 10

*Marin v. Const. Realty, LLC,*
128 A.D.3d 505 (App. Div. 2015) ...............................................................13

*MBIA Ins. Corp. v. Merrill Lynch,*
81 A.D.3d 419 (1st Dep't 2011) ...........................................................20, 21

*Meridian Fin. Servs., Inc. v. Phan,*
67 Cal.App.5th 657 (2021) ...........................................................................20

*MLBP v. Opening Day Prods.,*
385 F.Supp.2d 256 (S.D.N.Y. 2005) ...........................................................18

*Paul v. BofA,*
2011 WL 684083 (E.D.N.Y. Feb. 16, 2011) ...............................................21

*Pure Power Boot Camp v. Warrior Fitness Boot Camp,*
813 F.Supp.2d 489 (S.D.N.Y. 2011) ...........................................................15

*Rosenthal v. Kingsley,*
674 F.Supp. 1113 (S.D.N.Y. 1987) ...........................................................18

*Starr Indem. v. Brightstar Corp.,*
388 F.Supp.3d 304 (S.D.N.Y. 2019), *aff'd*, 828 F.App'x 84 (2d Cir.
2020) ...............................................................................................................13

*Teachers Ins. v. Wometco Enters.,*
833 F.Supp. 344 (S.D.N.Y. 1993) ...............................................................21

**Rules**

Fed. R. Civ. P. 56 .................................................................................................9

# I.    **INTRODUCTION**

This case represents Plaintiffs' latest attempt to rewrite contracts they freely negotiated with AMC and obtain millions of dollars to which they are not entitled. Plaintiffs—producers of the television show *The Walking Dead*—entered into comprehensive profit-participation agreements with AMC in 2009-2010, after months of negotiations led by their experienced entertainment lawyers and agents.    Those agreements already delivered approximately $70 million in profit participation to Plaintiffs (and tens of millions in fixed compensation) and will continue to yield millions more in future payments as the show continues to earn revenue.

But Plaintiffs are not satisfied—they want to extract more money by piggybacking on payments AMC made to other show participants who are not parties here, arising from three entirely unrelated transactions: (1) AMC's settlement of a separate lawsuit involving different parties, (2) AMC's agreement to provide an advance to a writer-producer to acquire his exclusive services, and (3) AMC's subsequent buyout of that writer's rights.    Plaintiffs allege these unrelated deals somehow triggered the "Most Favored Nations" ("MFN") clauses in their agreements.    Their attempt to obtain a windfall from these separate transactions is unsupported by the contracts, the undisputed facts, and the law.    This case is ripe for summary judgment.

The calculation of Plaintiffs' profit participation payments is governed by the "Modified Adjusted Gross Receipts" ("MAGR") definition.    The MFNs do not create an independent entitlement to payment—they are *entirely* dependent on the MAGR definition.    Under the MFNs, if, *and only if*, AMC provides another profit participant with an improved MAGR definition, then Plaintiffs receive that new MAGR definition. The interaction between the MAGR definition and MFNs is fatal to Plaintiffs' claims, as it makes unmistakably clear they have no right to any compensation arising from these unrelated transactions.

It is undisputed that the MAGR definition determines how much and when Plaintiffs are entitled to profit participation payments.    Plaintiffs do not have a right to

Gibson, Dunn &
Crutcher LLP

"profits," however defined; they only have a right to a percentage of MAGR. The MAGR definition memorializes every aspect of how MAGR is calculated and paid. Because calculating MAGR involves hundreds of variables—including what revenues are included, how to measure them, and what to deduct—these terms are captured in the 17-page "MAGR definition" to ensure clarity, consistency, and enforceability.

By their express and unambiguous terms, the MFN clauses are conditional; triggered only if AMC adopts a more "favorable" "MAGR definition" for another participant. When that occurs, AMC is required to extend the same definition to Plaintiffs. The MFNs do not apply otherwise and do not create independent rights or additional compensation outside the existing MAGR framework. In short, the MFNs were never intended to serve as a wide-reaching vehicle to extract extra payments outside the defined MAGR framework and cannot be twisted into an independent entitlement to "profits" from unrelated transactions between AMC and third parties.

Plaintiffs' claims for more compensation fail because no new "MAGR definition" was created, adopted, or referenced in the three transactions at issue. Each was a bespoke, one-off business arrangement unrelated to Plaintiffs, involving separate rights, parties, business considerations, and payment streams. Because the contractual condition for triggering the MFN—a new written "MAGR definition"—never occurred, Plaintiffs' claims fail as a matter of law.

In fact, it is undisputed that whenever AMC adopted a more favorable MAGR definition for another participant, AMC extended those terms to Plaintiffs, honoring its MFN commitments and increasing their MAGR payments. AMC has consistently acted in full compliance with Plaintiffs' contracts and in good faith, yet Plaintiffs now seek additional payments beyond what the agreements allow, attempting to turn contractual protections into a vehicle for extra, unearned compensation.

Even assuming Plaintiffs' MFNs could somehow be triggered by these unrelated transactions—and they cannot—summary judgment is still warranted. Plaintiffs say the MFNs entitle them "to the same valuation" of "their MAGR interests" as the "valuation"

applied to other participants' MAGR. But their contracts don't say this; there is no contractual basis for using these transactions with other participants to "value" MAGR. The agreements provide no formula, allocation method, or mechanism for determining the value of MAGR from settlements, advances, or buyouts of unrelated participants. Any attempt to impose such a calculation would be speculative, vague, arbitrary, and indefinite. Plaintiffs' own witnesses offered conflicting and unworkable theories to quantify these amounts, further confirming that no enforceable contractual right exists. Plaintiffs' theory—seeking a windfall from unrelated deals—has no basis in the contracts, the record, or New York law.

Under settled New York precedent, courts cannot rewrite or expand unambiguous contracts to supply missing terms or impose obligations the parties never agreed to. *Joseph Martin v. Schumacher*, 52 N.Y.2d 105, 109 (1981). Plaintiffs' theory would require the Court to construct a new compensation mechanism out of whole cloth from unrelated transactions with unrelated parties, which the parties here never agreed to— exactly what New York law forbids.

Three Plaintiffs—Kirkman, Hurd, and Alpert—also seek compensation under their contracts for a spinoff show, *Fear the Walking Dead*, but those agreements contain no MFN clauses, as a California court already held. Nothing in those agreements entitles them to additional compensation. Plaintiffs' implied covenant claim—that AMC should have "structured" unrelated transactions to trigger their MFNs—also fails as a matter of law. The covenant cannot create obligations not found in the contract, nor require a party to alter independent business arrangements to confer a windfall never contemplated by the agreements.

This is Plaintiffs' third attempt to relitigate *The Walking Dead* compensation. They lost the first at trial and the second on summary judgment in California state court. This third attempt fares no better. The MFNs do not say what Plaintiffs wish they did. The MAGR definition governs profit participation, and the MFNs do not manufacture new entitlements from unrelated transactions. Under settled New York law, the Court

cannot invent contract terms, infer a missing formula, or enforce an indefinite obligation. The undisputed facts—the contracts' text, Plaintiffs' admissions, and binding precedent—point to a single conclusion: summary judgment for AMC is warranted.

## II.  <u>BACKGROUND</u>

### A.  Plaintiffs Negotiate MFN Clauses Tied to the MAGR Definition

Plaintiffs were executive producers of *The Walking Dead*.  SUF 1.  In Plaintiffs' producer agreements, AMC agreed to pay each Plaintiff fixed compensation, including per-episode fees, and contingent compensation, called MAGR participation.  SUF 2-3. Kirkman, Hurd, and Alpert entered additional contracts, with contingent compensation rights for *Fear The Walking Dead*.  SUF 4-5.  All contracts are governed by New York law.  SUF 6.

Plaintiffs' contracts were fiercely negotiated by prominent lawyers and agents in Hollywood.  Kirkman, Alpert, and Mazzara, for example, were represented by CAA— one of the most powerful agencies in the industry.  SUF 7.

The contingent compensation provisions of Plaintiffs' agreements provided that their participation would be calculated as a percentage of MAGR.  SUF 8.  MAGR is a pool of certain revenues or receipts, less certain expenses, associated with a series.  SUF 9.  The formula for calculating MAGR is detailed in a document called a MAGR "definition," SUF 10, a lengthy document containing approximately 80 sections and subsections enumerating the precise revenues, fees, and costs comprising the MAGR formula, SUF 13-14.

Plaintiffs also obtained MFN clauses.  The precise language of each MFN varies, but all provide that certain participants on *The Walking Dead* cannot receive a more "favorable" MAGR definition than Plaintiffs.  In other words, if AMC calculates MAGR for other participants using a more favorable MAGR definition, Plaintiffs are also entitled to have MAGR calculated using that definition:

- <u>Kirkman</u>: "[I]n no event shall MAGR be defined, computed, or paid on a basis less favorable than for any other non-cast individual participant on the Series."

SUF 16.

- Hurd: "In no event shall [Hurd]'s MAGR participation be defined less favorable than the MAGR definition accorded to the Author, Writer, director or any other individual executive producer on the Series."  SUF 17.

- Alpert: "In no event shall [Alpert]'s MAGR participation be defined less favorable than the MAGR definition accorded to the Author or any other individual executive producer on the Series."  SUF 18.

- Eglee: "MAGR shall be defined, computed, and paid in accordance with the definition thereof applicable to Frank Darabont and Gale Anne Hurd in connection with the series."  SUF 19.

- Mazzara: "[I]n no event shall the MAGR participation hereunder be defined, calculated or accounted for (including the frequency of and information to be provided by accounting statements and the grant and scope of audit rights, regardless whether part of a MAGR definition) less favorably than the MAGR definition (and such accounting and audit provisions) accorded to any other individual rendering services on the Series."  SUF 20.

Pursuant to these MFN clauses, in 2014, 2015, and 2018, AMC provided Plaintiffs with improved MAGR definitions after other participants received them.  SUF 21-23.

**B.    Darabont/CAA Sue AMC**

Frank Darabont, the showrunner for *The Walking Dead* until he was terminated in 2011 during the second season, was also a profit participant.  In 2013, Darabont and CAA sued AMC in New York.  SUF 24.  Darabont/CAA raised numerous claims: some related to how AMC defined MAGR for *The Walking Dead*; many did not.  For example, Darabont/CAA alleged AMC breached its contracts by failing to:

- give Darabont a screen credit, SUF 25;

- negotiate with Darabont to render services on *The Walking Dead* Season 3, SUF 26;

- negotiate with Darabont to render services, earn fees, and receive screen

1       credit on derivative works, SUF 27;

2       • give Darabont a greater percentage of MAGR, SUF 28-29;

3       • pay Darabont for other shows, SUF 30-31; and

4       • timely provide him with a MAGR definition, SUF 32.

5       In 2018, Darabont/CAA filed a second lawsuit against AMC in New York, alleging

6   AMC didn't comply with the MAGR definition and obstructed an audit.  SUF 33-34.

7       **C.    Plaintiffs Sue AMC And Lose**

8       In 2017, Plaintiffs sued AMC in California, arguing AMC's MAGR definition was

9   not enforceable, and that, even if it was, AMC calculated MAGR incorrectly.  *Kirkman*

10  *v. AMC*, 2020 WL 4364279, at *1-2 (Cal. Super.).

11      In 2020, the California court held an eight-day bench trial on seven contract

12  interpretation issues, and issued a 59-page decision ruling for AMC on all seven issues.

13  The court held Plaintiffs' contracts (the same ones at issue here) unambiguously require

14  that "AMC's definition of MAGR *must* be used to define, compute, account for, and pay

15  MAGR."  *Kirkman*, 2020 WL 4364279, at *5.  The court also found that Plaintiffs do not

16  have MFNs on *Fear*.  *Id.* at *27 ("The *Fear the Walking Dead* Agreements do *not*

17  incorporate any MFN clause").  The court thereafter granted summary adjudication to

18  AMC on Plaintiffs' implied covenant claim.  *Kirkman*, 2022 WL 22901585, at *13.

19      The California Court of Appeal unanimously affirmed the trial court's rulings.

20  *Kirkman v. AMC Film Holdings, LLC*, 2024 WL 4664181 (Cal. Ct. App., Nov. 4, 2024).

21      **D.    Darabont/CAA Settle**

22      After Plaintiffs lost their 2020 trial, AMC and Darabont/CAA mediated their

23  dispute intensely over three days in May/June 2021.  SUF 35.  The parties did not discuss

24  MAGR definitions; they simply discussed potential settlement numbers with the

25  mediator.  SUF 36.  AMC wanted to pay less, and Darabont/CAA wanted more.

26  Ultimately, the mediator made a $200 million mediator's proposal, and Darabont/CAA

27  and AMC agreed.  SUF 37.  There is no evidence the mediator engaged in MAGR

28  calculations (or any calculations at all) when arriving at his proposal.

1    Plaintiffs' transactional counsel informed CAA that they learned "CAA may be
2    mediating" to "settle" the New York lawsuits, stating, "we request … that you will ensure
3    that … any settlement permit our mutual clients to obtain the benefit of the same bargains
4    pursuant to their right to be treated on a most favored nations basis with other
5    participants." SUF 38.

6        On July 16, 2021, AMC and Darabont/CAA settled. SUF 39. Darabont/CAA gave
7    up various rights in exchange for $200 million from AMC. SUF 40. Darabont/CAA also
8    received royalties on certain future streaming revenues. SUF 41. Darabont/CAA
9    released any claims against AMC



15    " SUF 43-44. The settlement thus resolved much more than just the claims in
16    the litigation.

17        The settlement did not provide that Darabont/CAA would receive MAGR
18    payments under an improved MAGR definition. SUF 45. To the contrary,
19    Darabont/CAA *gave up* compensation rights in the settlement—including to MAGR—
20    for any show in the "TWD Universe." SUF 42-44. This included *The Walking Dead*,
21    *Fear*, and other shows, such as *Tales of the Walking Dead* and *The Walking Dead: World*
22    *Beyond*, and all future shows in the ever-expanding TWD Universe. *Id.*

23        After the settlement, Plaintiffs' transactional counsel contacted CAA again to
24    confirm "whether CAA ensured … that CAA's settlement permits [Plaintiffs] to obtain
25    at a minimum the benefit of the same bargain pursuant to their right to be treated on a
26    most favored nations basis with other participants." SUF 46-47. CAA responded that it
27    was "unsupportable and unrealistic" for Plaintiffs to think CAA would "ensure[]
28    [Plaintiffs] benefitted" from the settlement. SUF 48-49.

Gibson, Dunn &
Crutcher LLP

**E.** █████████ **Enters An MFN Amendment, Overall, and Buyout**

In 2018, █████████████ another producer and participant on *The Walking Dead*, agreed that in exchange for not joining the ongoing lawsuits, his MFN would be amended to provide that it *would* include litigation settlement payments (not just MAGR definition changes) if those lawsuits settled. SUF 50. Specifically, "on a non-precedential basis" (i.e., a one-time give █████████ and his representatives should not expect again on deals for other shows), AMC agreed ██████████ MFN would provide him "██████████████

████████████████████████████████████████████████

██████████████████ (i.e., the 2013 Darabont/CAA action and Plaintiffs' 2017 California state court action). SUF 50-51. The MFN amendment also included a formula to calculate the money ███████ would receive if a settlement payment was made. SUF 52. Plaintiffs' MFNs do not have any such formula. SUF 16-20.

███████████ also entered another agreement (an "Overall" deal), to work exclusively with AMC. SUF 53. In exchange, ██████████ received upfront payments from AMC; some were credited as advances against ████████ future MAGR payments (i.e., rather than receive MAGR payments as they became due under the MAGR definition, he received some immediately in exchange for entering the Overall). SUF 53-54.

Later, in 2022, AMC bought out █████████ rights in *The Walking Dead* universe. SUF 55. AMC paid $42 million to ███████ in exchange for ███████ releasing all MAGR rights in *The Walking Dead* and *Fear*, as well as other non-MAGR payments he would have been due. ██████████ also released any claims under his MFN amendment. SUF 56. ████████ buyout did not provide █████████ with a new MAGR definition—rather, it extinguished ███████ rights to MAGR. SUF 56-59.

**F.** **Plaintiffs File This Suit**

In November 2022, Plaintiffs filed this lawsuit, alleging AMC breached their MFNs by refusing to pay them in connection with the Darabont/CAA settlement, ██████ Overall, and ██████ buyout. FAC ¶¶ 52–58. The *Fear* Plaintiffs also claim AMC's alleged failure to honor the MFNs for *The Walking Dead* caused them to receive less

compensation for *Fear*. *Id.* ¶¶ 65-71.  Plaintiffs alternatively allege AMC breached the implied covenant of good faith by "structuring" the challenged transactions to avoid triggering Plaintiffs' MFNs. *Id.* ¶¶ 72-79.

### III. <u>LEGAL STANDARD</u>

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A defendant need only "point[] out" the absence of admissible evidence supporting the plaintiff's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### IV. <u>ARGUMENT</u>

### A. Counts 1&2: The MFNs' Unambiguous Language Forecloses Plaintiffs' Contract Claims

The MFNs do not provide freestanding rights to compensation.  They have one, limited purpose: if AMC provides another participant with a better "MAGR definition," Plaintiffs receive that definition.  The MFNs are not triggered by anything else, and they grant no other benefit.  It is undisputed that AMC did not create or use a new MAGR definition in the transactions here.  SUF 60-65.  That means Plaintiffs' MFNs were not triggered, and their contract claims fail as a matter of law.

#### 1. The MFNs' Text Shows They Are Limited to the MAGR Definition

#### a. Non-Kirkman Plaintiffs' MFNs

The MFNs for each Plaintiff other than Kirkman explicitly state that the MFN is triggered only by changes to the "MAGR definition."

"Under New York law," "the initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties."  *L. Debenture Tr. v. Maverick Tube*, 595 F.3d 458, 465 (2d Cir. 2010) (quotations omitted).  "A contractual term is ambiguous if reasonable minds could differ as to [the] meaning of the term."  *Dish Network v. Ace Am. Ins.*, 21 F.4th 207, 211 (2d Cir. 2021) (quotations omitted).  "Ambiguity is determined by looking within the four corners of the document, not to outside sources."  *Id.*  "[T]he court should not find the contract ambiguous where the interpretation urged by one party

1  would strain [ ] the contract language beyond its reasonable and ordinary meaning."

2  *Debenture*, 595 F.3d at 467 (quotations omitted).

3       Alpert's and Hurd's MFNs are triggered only if another individual receives a more

4  "favorable ... MAGR definition," and Mazzara's MFN is triggered only if his MAGR is

5  accounted for "less favorably than the MAGR definition" accorded to others.  SUF 17-

6  18.[1]  Eglee's is even narrower; he receives the same MAGR "definition" as "Darabont

7  and ... Hurd."  SUF 19.

8       Plaintiffs allege the MFNs provide a free-standing right to compensation,

9  disconnected from the MAGR definition, and were triggered by the settlement, advances,

10  and buyout even though those transactions did not change the MAGR definition.  They

11  say MFNs have a "special meaning," under which they must receive "the same value,

12  MAGR point for MAGR point, as other profit participants" (with "MAGR point[s]"

13  referring to a participant's MAGR percentage).  FAC ¶ 31.  Therefore, they say, any

14  payment to another participant—made for any reason—must be divided by the

15  participant's MAGR points to determine a "per point" value, and Plaintiffs must receive

16  a payment calculated by multiplying this "per point" value by Plaintiffs' MAGR points.

17  *Id.*

18       This is not what the MFNs say.  Their plain language provides they are completely

19  dependent on the MAGR definition and triggered only by provision of a more favorable

20  "MAGR definition"—nothing else.  The non-Kirkman Plaintiffs' claims fail as a matter

21  of law under the unambiguous contract language.

22       **b.**   **Kirkman's MFN**

23       The text of Kirkman's MFN is slightly different, but is also triggered only by

24  changes to the MAGR definition.

25       The contingent compensation provision of Kirkman's contract states:

26

27  [1]  Mazzara's MFN also applies to "accounting and audit provisions" governing

28  "accounting statements and ... audit rights."  SUF 20.  Plaintiffs don't allege any
participant received more favorable "accounting and audit provisions" than Mazzara.

> MAGR *shall be defined, computed, accounted for and paid* in accordance *with the standard definition* thereof ... ; in no event shall MAGR *be defined, computed, or paid* on a basis less favorable than for any other non-cast individual participant on the Series.

SUF 15-16 (emphases added). The first clause states MAGR is "defined, computed, accounted for and paid" using AMC's "standard" MAGR "definition." SUF 15.[2] The latter clause—the MFN—says MAGR cannot be "defined, computed or paid on a basis less favorable" than for certain other participants.

When a contract uses two similar phrases, they should be interpreted to have the same meaning. *Giray v. Ulukaya*, 181 N.Y.S.3d 93, 94 (App. Div. 2023) (when parties use "a certain word or expression in different parts of [a contract], it is reasonable to suppose that it was always used in the same sense, unless a different meaning was plainly intended"). Read together, these two clauses establish that (1) MAGR must be "*defined, computed*, accounted for and *paid*" using AMC's "definition," (2) the MFN is triggered only if MAGR is "defined, computed, or paid" on a more "favorable" "basis" for another participant, and thus (3) the MFN is triggered only if another participant receives a more favorable MAGR "definition," because that is the only "basis" by which MAGR can be "defined, computed, or paid."

Kirkman's attorneys say MAGR can be "paid" in a more favorable way, even if it is not "defined" more favorably under an improved MAGR definition. SUF 66. This ignores that Kirkman's contract says "MAGR *shall be ... paid in accordance with* the [MAGR] definition." SUF 11. A payment *not* made "in accordance with" a MAGR definition is not a MAGR payment. Similarly, the MFN is triggered only if Kirkman's MAGR is "defined, computed or paid on a *basis* less favorable" than the basis used for other participants. The only "basis" for paying MAGR is the definition, so the only way for MAGR to be "paid on a *basis* less favorable" than other participants is for Kirkman to receive a worse MAGR definition than those participants.

---

[2] The court in Plaintiffs' prior lawsuit held that this sentence provides that AMC's MAGR definition is binding and governs Plaintiffs' MAGR. *Kirkman*, 2020 WL 4364279, at *5.

Gibson, Dunn & Crutcher LLP

The *ejusdem generis* and *noscitur a sociis* canons of construction also dictate that each word in the phrase "defined, computed, or paid," SUF 16, should be interpreted by reference to the other terms in that phrase. Under these canons, "[t]erms in a provision are construed in accordance with the meaning of the words that are associated with them." *In re Enron*, 380 B.R. 307, 322 (S.D.N.Y. 2008). And "where several specific terms" (like 'defined' and 'computed') "are followed by a more general term" (like 'paid') "the general term is deemed to share the characteristics of the specific terms that precede it." *Id.* "Defined" and "computed" refer to using a MAGR definition to compute the amount of contingent compensation owed by summing certain receipts less certain expenses. SUF 12. The term "paid" at the end of this phrase should be interpreted similarly—i.e., MAGR is "paid" when a MAGR definition is used to compute the payment owed to a participant.

Under the plain language of Kirkman's contract, and well-settled canons of construction, Kirkman's MFN—like those of the other Plaintiffs—is triggered only by improvements to the MAGR definition.

## 2.     Plaintiffs' Expert Is Irrelevant

Plaintiffs proffer Richard Levy, who claims there is a television industry custom and practice that an MFN, regardless of its terms, provides the same MAGR "point value" as other participants. SUF 88-89. He says if another participant receives "contingent compensation," that compensation is divided by the participant's points to determine the "point value", and then multiplied by the MFN-holder's points to determine their compensation. SUF 90. Levy's opinion cannot help Plaintiffs avoid summary judgment.

First, when a "contract is unambiguous, [custom and practice] evidence should not be considered." *Marin v. Const. Realty, LLC*, 128 A.D.3d 505, 509 (App. Div. 2015). Because the MFNs are unambiguous, Levy's opinions are irrelevant.

Second, Levy's opinion, even if true, wouldn't help Plaintiffs. Levy says MFNs are triggered if another participant "receives money as a result of their contingent compensation rights that is determined or paid out based on a point value that is greater

than the point value of the holder of MFN rights."  SUF 89.  But Darabont/CAA and ██████ were paid to give up many rights—including rights unrelated to MAGR—and there is no evidence they were paid a "point value" for their MAGR rights.

Third, Levy's bare assertion that a custom and practice exists is not admissible.  A party proffering custom evidence must make a "*prima facie* case for the admission of evidence of custom and usage" by "establish[ing] by competent evidence, that the practice is fixed and invariable." *Cerveceria Modelo v. C.B. Brand Strategies*, 2023 WL 2185899, at *2 (S.D.N.Y. Feb. 23, 2023) (quotations omitted).  If there is no *prima facie* evidentiary showing the custom is *universal* in the industry, the custom opinion is inadmissible on summary judgment. *See Starr Indem. v. Brightstar*, 388 F.Supp.3d 304, 347–48 (S.D.N.Y. 2019*), aff'd*, 828 F.App'x 84 (2d Cir. 2020).

Plaintiffs have not made this *prima facie* showing.  Levy says MFNs are "universally understood" to have the meaning he gives them, SUF 88, but he admitted he had *never* seen an MFN that was triggered by a lump-sum settlement, buyout, or advance—testifying "this case is a bit of a unicorn."  SUF 91.  Plaintiffs' transactional counsel also have *never* seen MAGR MFNs apply to litigation settlements, buyouts, or advances.  SUF 79-82.  Levy's bare assertion that a custom exists, unsupported by evidence, cannot create a dispute of material fact.

### 3.     Plaintiffs Admit AMC Did Not Provide A New MAGR Definition

It is undisputed that AMC did not provide Darabont/CAA or ██████ any new MAGR definition in the settlement, Overall, or buyout.

AMC's MAGR definition is a 17-page document with approximately 80 sections and subsections detailing the calculation of MAGR—specifying what receipts are included and which expenses are deducted.   SUF 21-23.

The lawyers who negotiated Plaintiffs' MFNs admitted AMC did not provide Darabont/CAA or ██████ any new MAGR definition in the settlement or buyout, SUF 60-65, 80-82—and the MAGR definition is typically a multi-page document, which specifies the elements of MAGR, SUF 14.  There is no evidence such a document was

used in connection with the transactions at issue.

Because the MFNs are triggered only by using a more favorable MAGR definition, and it is undisputed that no such definition was used here, summary judgment should be granted on Plaintiffs' MFN claims.

## B.    Counts 1&2: No Extrinsic Evidence Supports Plaintiffs' Claims

Even when a contract is ambiguous, summary judgment is appropriate "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Compagnie Financiere v. Merrill Lynch*, 232 F.3d 153, 157–58 (2d Cir. 2000). Here, no extrinsic evidence supports Plaintiffs' interpretation of the MFNs—so even if the MFNs were ambiguous (they are not), summary judgment is appropriate.

*Negotiation History.* There is no evidence the parties suggested the MFNs would be triggered by settlements, buyouts, or advances during negotiations.

*Course of Dealing.* Plaintiffs now allege MAGR advances trigger their MFNs, but were aware for years of MAGR advances paid to other participants (including some Plaintiffs) and never complained until filing this lawsuit. SUF 75-78. This demonstrates Plaintiffs did *not* believe advances triggered the MFNs.

███ *Amended MFN.* ███ had to negotiate a separate, "non-precedential" amendment expressly providing that his MFN applies to settlements—and including a special formula to calculate what he would receive—which demonstrates MFNs normally do not apply to settlement payments. Because Plaintiffs' MFNs, by contrast, do not apply to settlement payments, they contain no formula like ███

*Correspondence with CAA.* When Plaintiffs learned of the settlement negotiations, their attorneys repeatedly reached out to CAA to demand it "ensure … any settlement permit [Plaintiffs] to obtain the benefit of the same bargains" as Darabont/CAA. SUF 38. CAA refused, saying it was "unsupportable and unrealistic" to "ensure[] [Plaintiffs] benefitted" from the settlement. SUF 48. If the MFNs automatically applied to settlements—as Plaintiffs now argue—there would have been

Gibson, Dunn & Crutcher LLP

1    no reason for Plaintiffs' attorneys to beg CAA to "ensure" Plaintiffs received a benefit.

2        There is no extrinsic evidence supporting Plaintiffs' interpretation of the MFNs.

3    Summary judgment is warranted.

### C. Counts 1&2: The Contracts Do Not Explain How To Apply The MFNs To These Transactions

6        Plaintiffs' claims fail for another reason: the MFNs do not explain how to calculate

7    any payment they are allegedly owed.  Plaintiffs say the MFNs apply to the settlement,

8    advance, and buyout, and entitle Plaintiffs to more money.  But the MFNs do not say

9    anything about how to calculate the amount Plaintiffs are allegedly owed from these

10   transactions.  The testimony of Plaintiffs' lawyers who negotiated their contracts laid this

11   bare: they could not agree about how to calculate an MFN payment from these

12   transactions; some even said the Parties would have to agree on payment at a later date.

13   SUF 70-74, 84.  But an agreement to agree is not enforceable, and a jury cannot create a

14   payment formula the Parties did not agree to.  Because the MFNs do not explain how

15   Plaintiffs allegedly should be paid from these transactions, Plaintiffs' contract claim

16   seeking to apply the MFNs to these transactions fails.

17       "[B]efore the power of law can be invoked to enforce a promise, it must be

18   sufficiently certain and specific so that what was promised can be ascertained." *Joseph*

19   *Martin*, 52 N.Y.2d at 109.  "New York courts will not enforce a material contract term if

20   it is impossible to determine what in fact the parties have agreed to."  *Pure Power v.*

21   *Warrior Fitness*, 813 F.Supp.2d 489, 514 (S.D.N.Y. 2011).  "A compensation clause is

22   sufficient and enforceable only if the amount of compensation can be determined in

23   accordance with the terms of the agreement without any further expression by the

24   parties." *Alter v. Bogoricin*, 1997 WL 691332, at *6 (S.D.N.Y. Nov. 6, 1997) (quotation

25   omitted).  "[I]f the terms of the agreement are so vague and indefinite that there is no

26   basis or standard for deciding whether the agreement had been kept or broken, or to

27   fashion a remedy, and no means by which such terms may be made certain, then there is

28   no enforceable contract." *Candid Prods.*, 530 F.Supp. at 1333–34; *id.* n.11 (collecting

1  cases).   And an "agreement to agree, in which a material term is left for future

2  negotiations, is unenforceable." *Joseph Martin*, 52 N.Y.2d at 109.

3      Here, there is no basis in the contracts for calculating how much money Plaintiffs

4  should receive from the Darabont/CAA settlement, ███████ advance, or buyout.  The

5  MFNs say Plaintiffs will have a "MAGR definition" that is "no less favorable" than the

6  definition afforded to certain other participants.  *Supra* pp.9-12.  By contrast, the MFNs

7  say nothing about calculating what to pay Plaintiffs if a settlement, advance, or buyout

8  occurs.

9      This makes it impossible to determine how much Plaintiffs are owed from these

10  transactions (if anything).  Plaintiffs allege their MFNs entitle them to have "their MAGR

11  paid on the same value, MAGR point for MAGR point, as other profit participants."  FAC

12  ¶ 31.  But the MFNs don't say this.  Unlike ███████ amended MFN, Plaintiffs' MFNs

13  do not have a formula for calculating an MFN payment from a settlement (or buyout or

14  advance).   Plaintiffs' allegation also assumes one can compare the "value" of

15  Darabont/CAA ███████ "MAGR point[s]" to the "value" of Plaintiffs' own "MAGR

16  point[s]" to determine which is worth more.  But the MFNs do not explain how to (1)

17  apportion the $200 million Darabont/CAA settlement and $42 million ███████ buyout to

18  determine the value of Darabont/CAA and ███████ MAGR points, or (2) calculate the

19  value of Plaintiffs' MAGR points, which will generate money in the future (unlike

20  Darabont/CAA and ███████ who gave up MAGR and cannot receive future MAGR

21  payments).

22      For example, the Darabont/CAA settlement resolved multiple claims, many of

23  which were not related to MAGR—such as whether Darabont should have received

24  screen credit or been hired for later seasons.   SUF 24-29.   It also involved

25  Darabont/CAA's release of compensation rights to *all* shows in *The Walking Dead*

26  universe, including spinoffs, and rights to non-MAGR compensation. SUF 30-31. Even

27  Plaintiffs do not claim their MFNs apply to these non-MAGR and non-*Walking Dead*

28  claims and rights; they argue only that their MFNs are triggered when "MAGR [is] paid"

on *The Walking Dead*.  SUF 66.  But the MFNs do not explain how AMC would determine what portion of the $200 million Darabont/CAA settlement payment is a *Walking Dead* "MAGR payment" subject to the MFN, and which portion is not. Plaintiffs' attorneys who negotiated the MFNs could not agree on how to divide up the $200 million: some were unsure whether or how much of the $200 million was a MAGR payment and did not know how to divide it between MAGR and other things, SUF 70-71; others said experts would need to decide, SUF 73; another said the entirety should be counted towards MAGR, SUF 72.

Plaintiffs also still have MAGR rights and will continue to receive MAGR payments for years (possibly decades) as the show generates more money—while Darabont/CAA and ███████ *gave up* MAGR and will not receive those payments.  SUF 42-44, 55-57.  The MFNs do not explain how AMC should value Plaintiffs' continuing MAGR rights—leaving this aspect of the MFN calculation undefined too.  Plaintiffs' attorneys also could not agree on how Plaintiffs' continuing MAGR rights factored into the MFN calculation: one said his client "maybe" would have to give up his MAGR rights but "d[id]n't know" for sure, SUF 86-87; another said his client *would* have to give up MAGR, SUF 83; and another said his client and AMC would have to negotiate over how his ongoing MAGR would be addressed in the MFN calculation, SUF 84-85.

"[W]here plaintiff claims to be entitled to a percentage of profits, there must be some identification of what 'profits' are actually covered by the contract terms." *Rosenthal v. Kingsley*, 674 F.Supp. 1113, 1120 (S.D.N.Y. 1987).  Thus, in *Rosenthal*, the court granted summary judgment on plaintiff's claim that he was entitled to "25% of defendant's gross professional income," when the alleged contracts did not specify the percentage of compensation or exactly what revenues his compensation applied to.  *Id.* In *Holzer v. Kaplan*, summary judgment was granted where there was "no specific formula under which [plaintiff's] compensation was to have been calculated."  1991 WL 230623, at *1 (S.D.N.Y. 1991).  This case is no different.  The MFNs do not explain how AMC should determine what payments are covered by the MFNs, or how AMC should

divide transaction payments into MFN and non-MFN portions.

A contract is also too indefinite to be enforced when the plaintiff's "testimony is contradictory and unclear regarding what compensation he was promised." *Allen v. Robinson*, 2011 WL 5022819, at *6 (S.D.N.Y. Oct. 19, 2011); *Gutkowski v. Steinbrenner*, 680 F.Supp.2d 602, 611 (S.D.N.Y. 2010). Here, Plaintiffs' negotiators cannot agree on how the MFNs operate or how their clients' compensation should be determined. *Supra* p.17. Likewise, an "agreement to agree" on compensation is unenforceable, *Joseph Martin*, 52 N.Y.2d at 109; *MLBP v. Opening Day*, 385 F.Supp.2d 256, 270–71 (S.D.N.Y. 2005)—yet, some of Plaintiffs' representatives say the MFNs require future negotiations and agreement among the parties to operate. *Supra* p.17. That is fatal to Plaintiffs' claim.

Summary judgment also must be granted when "the record contains no evidence that there was ever a 'meeting of the minds' as to the remedy for breaching [a] provision." *Bandler v. BPCM*, 2014 WL 5038407, at *10 (S.D.N.Y. Sept. 29, 2014), *aff'd*, 631 F.App'x 71 (2d Cir. 2016). In *Bandler*, the plaintiff-accountant claimed the defendant had to give 120 days' notice before terminating the contract, the defendant failed to give notice, and, consequently, the plaintiff was entitled to the amount it would have billed for an additional 120 days—determined "pro rata" by examining the past years' billings. *Id.* But nothing in the contract mentioned this "pro rata" formula, and there was "no evidence that the parties ever contemplated, much less agreed to, the pro rata formula." *Id.*

The same is true here. The MFNs do not explain how Plaintiffs are compensated if AMC fails to pay them after entering a settlement, advance, or buyout. Plaintiffs' transactional counsel could not agree on how the MFNs should be applied to these transactions. *Supra* p.17. Plaintiffs' damages expert proposes dividing the amounts paid to each participant in each transaction by their MAGR points to arrive at a "per point" value (e.g., dividing the $200 million paid to Darabont/CAA by Darabont/CAA's MAGR points), and then multiplying this "per point" amount by each Plaintiff's points to determine each Plaintiff's pro rata share of each payment. But this formula has no basis

1   in the MFNs, which say nothing about dividing payments or divining a "per point" value.

2   There is "no evidence that the parties ever contemplated, much less agreed to, the pro

3   rata formula for damages utilized by Plaintiffs." *Bandler*, 2014 WL 5038407, at *10.

4   Because the MFNs do not explain how they could apply to the transactions at issue,

5   or provide "the amount of compensation" Plaintiffs allegedly are entitled to, Plaintiffs'

6   contract claims fail as a matter of law. *Alter*, 1997 WL 691332, at *6.

7   **D.    Count 3: Plaintiffs Have No MFNs on *Fear***

8   Kirkman, Alpert, and Hurd say they should "have their contingent compensation

9   for *Fear the Walking Dead* treated identically as their contingent compensation for *The*

10  *Walking Dead*." FAC ¶ 69. But under the unambiguous language of Plaintiffs' *Fear*

11  contracts, they are entitled to the <u>MAGR definition</u> used on *The Walking Dead*—nothing

12  else.

13  Plaintiffs' *Fear* contracts unambiguously state "***[t]he definition of MAGR***

14  applicable to [Plaintiffs'] contingent compensation on *The Walking Dead* will also apply

15  to" their contingent compensation on *Fear*. SUF 5. However, as explained above, it is

16  undisputed that AMC never created a new "definition of MAGR" for *The Walking Dead*

17  in the transactions at issue. SUF 60-65. And Plaintiffs do not claim (nor could they) that

18  AMC uses a different MAGR definition for *Fear* than *The Walking Dead*.

19  Further, it is undisputed—and Plaintiffs are collaterally estopped from disputing—

20  that Plaintiffs' *Fear* contracts do not contain MFNs. In the California state court action,

21  Plaintiffs argued their *Fear* contracts include MFNs—and they lost. "The *Fear the*

22  *Walking Dead* Agreements do not incorporate any MFN clause." *Kirkman*, 2020 WL

23  4364279, at *27. Plaintiffs never challenged that part of the ruling, which was affirmed.

24  *See* 2024 WL 4664181. Plaintiffs are precluded from relitigating the issue. *Meridian v.*

25  *Phan*, 67 Cal.App.5th 657, 686 (2021) ("Issue preclusion prohibits the relitigation of

26  issues argued and decided in a previous case, even if the second suit raises different

27  causes of action.").

28  Therefore, even if Plaintiffs were right that their MFNs apply to *more* than the

MAGR definition, that would not impact their contingent compensation for *Fear*—where they have no MFNs, and are entitled only to the same "definition of MAGR" used on *The Walking Dead*.  Plaintiffs' *Fear*-based claims should be dismissed.

## E.    Count 4: The Implied Covenant Claim Fails

Plaintiffs' hail-mary argument is that if the settlement and buyout did not trigger their MFNs, then AMC violated the implied covenant of good faith and fair dealing by "structur[ing] its agreements with Darabont and ███████ in a manner designed to deprive Plaintiffs of the benefits of their MFN rights"  FAC ¶ 77.  In other words, Plaintiffs say AMC was obligated to "structure" its agreements with Darabont/CAA and ███████ in a way that *would* trigger the MFNs.  This claim fails.

***Duplicative.***   The implied covenant claim is duplicative of Plaintiffs' contract claim.  A "cause of action for breach of the implied covenant of good faith and fair dealing cannot be maintained" when it "is premised on the same conduct that underlies the breach of contract cause of action and is intrinsically tied to the damages allegedly resulting from a breach of the contract."  *MBIA v. Merrill Lynch*, 81 A.D.3d 419, 419–20 (1st Dep't 2011) (quotations omitted).  Here, Plaintiffs' implied covenant claim depends on the same facts (AMC's payments in the settlement and buyout, FAC ¶ 77), and seeks the same damages as Plaintiffs' contract claims.  Plaintiffs' damages expert does not even distinguish between the contract and covenant claims—she offers a single damages opinion for all claims.  SUF 74.

Plaintiffs cannot use the implied covenant claim as a fallback to pursue the same damages sought under their contract claims.  *MBIA*, 81 A.D.3d at 419.

***Contrary to the contracts.***  The claim also fails because it is contrary to the terms of Plaintiffs' contracts, which do not restrict how AMC "structure[s]" its transactions with other participants.  FAC ¶ 77.

A party may not invoke the covenant to "create an additional benefit for which [the parties] did not bargain."  *Ferguson v. Lion Holding*, 478 F.Supp.2d 455, 479 (S.D.N.Y. 2007).  "Even if an implied covenant does not directly contradict terms of the contract, it

cannot be used to add wholly new terms to the contract." *Keene Corp. v. Bogan*, 1990 WL 1864, at *14 (S.D.N.Y. Jan. 11, 1990).

Here, the contracts do not say AMC must "structure" its agreements with other participants to trigger Plaintiffs' MFNs. Plaintiffs cannot claim AMC was required to "structure" its transactions to trigger their MFNs when the contracts contain no such an obligation. *See Keene*, 1990 WL 1864, at *14; *Teachers v. Wometco.*, 833 F.Supp. 344, 349 (S.D.N.Y. 1993) ("the Court can not and should not rewrite the contract to include ... language which neither of the parties saw fit to insert in the contract"; rejecting implied covenant claim).

***No bad faith.*** Finally, there is no evidence AMC "structured" its agreements in bad faith—i.e., to injure Plaintiffs. AMC simply settled a long-running dispute (with Darabont/CAA) and entered a new business deal (with ████—it did not intend to harm Plaintiffs.

To show a violation of the implied covenant, "some intent must be proved." *Ferguson v. Lion Holding*, 478 F.Supp.2d 455, 469 (S.D.N.Y. 2007); *Paul v. BofA*, 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011). "Conduct which reaches the level of reckless disregard may be sufficient to evidence a breach of the implied covenant of good faith, but only if it is severe enough to warrant an inference that the party acted in bad faith, or intended to do harm." *Keene*, 1990 WL 1864, at *15.

Here, there is no evidence AMC structured the settlement or buyout to harm Plaintiffs. AMC's good faith is further corroborated by its history of honoring Plaintiffs' MFNs whenever other participants' MAGR definitions were improved. SUF 13. Judgment should be granted on the implied covenant claim for this reason as well.

## V.   CONCLUSION

Summary judgment should be granted in full.

Dated:  November 5, 2025              GIBSON, DUNN & CRUTCHER LLP


                                      By:  _____/s/ Ilissa Samplin_____
                                                   Ilissa Samplin

                                      *Attorneys for Defendants*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants AMC Film Holdings LLC, AMC Network Entertainment LLC, and AMC Networks Inc., certifies that this brief contains 7,000 words, which complies with the word limit of L.R. 11-6.1.


Dated:  November 5, 2025                 GIBSON, DUNN & CRUTCHER LLP


                              By:  _____*/s/ Ilissa Samplin*_____
                                         Ilissa Samplin

                                   *Attorneys for Defendants*